# IN THE SUPREME COURT OF CALIFORNIA

CHARLES E. WARD et al.,

Plaintiffs and Appellants,

v.

UNITED AIRLINES, INC.,

Defendant and Respondent.

S248702

Ninth Circuit

16-16415

Northern District of California

3:15-cv-02309-WHA

---

FELICIA VIDRIO et al.,

Plaintiffs and Appellants,

v.

UNITED AIRLINES, INC.,

Defendant and Respondent.

Ninth Circuit

17-55471

Central District of California

2:15-cv-07985-PSG-MRW

June 29, 2020

This opinion precedes companion case S248726,
also filed on June 29, 2020.

Justice Kruger authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu,
Cuéllar, and Groban concurred.

WARD v. UNITED AIRLINES, INC.

S248702

Opinion of the Court by Kruger, J.

From the air, the borders that divide state from state disappear. But in our federalist system, those borders still matter—even for those who make their living flying the friendly skies. In these consolidated cases and *Oman v. Delta Air Lines, Inc.* (June 29, 2020, S248726) ___ Cal.5th ___, we confront questions about how the laws of a single state might apply to employees who perform duties across the country, on behalf of an employer in the business of connecting the world.

Plaintiffs are pilots and flight attendants for a global airline based outside California. Plaintiffs reside in California but perform most of their work in airspace outside California's jurisdiction. They are not paid according to California wage law, but instead according to the terms of a collective bargaining agreement entered under federal law. The United States Court of Appeals for the Ninth Circuit has asked us to decide whether, given these circumstances, the airline is required to provide plaintiffs with wage statements that meet the various requirements of California law.

We conclude that whether plaintiffs are entitled to California-compliant wage statements depends on whether their principal place of work is in California. For pilots, flight attendants, and other interstate transportation workers who do not perform a majority of their work in any one state, this test is satisfied when California serves as their base of work

operations, regardless of their place of residence or whether a collective bargaining agreement governs their pay.

## I.

The consolidated cases before us arise from three class actions filed against defendant United Airlines, Inc. United is an air carrier that provides service between airports across the country and around the world, including to and from numerous airports in California. United is incorporated in Delaware and headquartered in Illinois, with a substantial administrative presence in Texas. Plaintiff Charles Ward is a pilot for United, while plaintiffs Felicia Vidrio and Paul Bradley are flight attendants. All three are California residents. (*Ward v. United Airlines, Inc.* (9th Cir. 2018) 889 F.3d 1068, 1071.)

Ward filed an action in state court on behalf of pilots, while Vidrio and Bradley each filed separate state court actions on behalf of flight attendants. All three flight crew members alleged that United's wage statements fail to provide them all the information required by Labor Code section 226 (section 226), in the format required by that provision. (See § 226, subd. (a).) Specifically, the flight crew members complained that although United issues them at least two wage statements a month, the wage statements do not (1) list a street address for United, instead providing only a post office box, or (2) include the hours worked and all applicable hourly rates that make up employee pay for the pay period, instead listing only the total amounts earned in various pay categories. The crew members sought civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.) on a representative basis; statutory penalties under section 226, subdivision (e) on a classwide basis; and injunctive

relief (*Ward v. United Airlines, Inc.*, *supra*, 889 F.3d at p. 1071).

United removed all three actions to federal court. In the *Ward* case, the district judge certified a class consisting of pilots who reside in California and pay California income taxes.[1] (*Ward v. United Airlines, Inc.* (N.D.Cal., Mar. 23, 2016, No. 3:15-cv-02309-WHA) 2016 U.S.Dist. Lexis 38896.) A different district judge consolidated the *Vidrio* and *Bradley* cases and certified a similarly defined class of California-based flight attendants. (*Vidrio v. United Airlines, Inc.* (C.D.Cal., Aug. 23, 2016, No. 2:15-cv-07985-PSG-MRW) 2016 U.S.Dist. Lexis 189537.)

In each case, the district court granted summary judgment to United. The district court in *Ward* held that the geographic reach of California wage and hour law—including section 226—is governed by a " 'job situs test,' which considers where an employee 'principally' worked." (*Ward v. United Airlines, Inc.* (N.D.Cal., July 19, 2016, No. 3:15-cv-02309-WHA) 2016 U.S.Dist. Lexis 94803, p. *10.) Because it was undisputed that under the district court's test the members of

---

[1] Under federal law, airline employees who work in more than two states are subject to the income tax laws of either the state where they reside or the state where they earn more than 50 percent of their airline pay. (49 U.S.C. § 40116(f)(2).) "For pilots and flight attendants, United applies state income tax laws based on the employee's residence because it determined that pilots and flight attendants 'rarely, if ever, perform more than half their work in any one state.' " (*Ward v. United Airlines, Inc.*, *supra*, 889 F.3d at pp. 1070–1071.)

the pilot class did not work principally in California, the court ruled that section 226 did not apply.

Several months later, the district court in *Vidrio* reached the same conclusion. (*Vidrio v. United Airlines, Inc.* (C.D.Cal., Mar. 15, 2017, No. 2:15-cv-07985-PSG-MRW) 2017 U.S.Dist. Lexis 40609.) The *Vidrio* court noted that since *Ward* was decided, other federal courts had also considered whether flight crew members may bring claims under California's wage and hour laws when most of the work is performed outside the state. In some of these cases, the courts had interpreted relevant California precedent to call for a different approach from the "job situs" test applied in *Ward*; in determining whether California law applies, these courts had weighed various factors in addition to job situs, including the parties' states of residence. (*Vidrio*, at pp. *12–*13.) The *Vidrio* court concluded that United would prevail under both the "job situs" test and the wider-ranging multifactor approach, since the *Vidrio* class members do not work principally in California and "United's ties to California are minimal relative to its overall business . . . ." (*Id.* at pp. *14–*15.) Absent greater employer ties to California, the court concluded, "[T]he class members' residency and receipt of wage statements in California is insufficient to obtain the benefits of California wage and hour laws when the work is principally performed outside of the state." (*Id.* at p. *15.)

Both sets of plaintiffs sought review, and the Ninth Circuit consolidated the appeals for purposes of oral argument. After argument, the Ninth Circuit ordered supplemental briefing addressing the Industrial Wage Commission (IWC) wage order regulating the transportation industry, IWC wage order No. 9–2001 (Wage Order No. 9). That wage order

4

extends various protections—including certain wage statement requirements—to transportation workers. But the wage order exempts from its protections employees who have entered into a collective bargaining agreement under and in accordance with the provisions of the Railway Labor Act, a federal statute governing labor relations in the railroad and airline industries. (See Wage Order No. 9, § 1(E); 45 U.S.C. § 151 et seq.) United pilots and flight attendants are parties to such a collective bargaining agreement.

After briefing was completed, the Ninth Circuit issued an order asking this court to resolve two unsettled questions of California law critical to the resolution of the crew members' section 226 claims. (*Ward v. United Airlines, Inc.*, *supra*, 889 F.3d at p. 1070.) Those questions, which we have reframed slightly (see Cal. Rules of Court, rule 8.548(f)(5)), are:

(1) Wage Order No. 9 exempts from its wage statement requirements an employee who has entered into a collective bargaining agreement in accordance with the Railway Labor Act. (See Cal. Code Regs., tit. 8, § 11090, subd. 1(E).) Does the Railway Labor Act exemption in Wage Order No. 9 bar a wage statement claim brought under section 226 by an employee who is covered by a collective bargaining agreement?

(2) Does section 226 apply to wage statements provided by an out-of-state employer to an employee who resides in California, receives pay in California, and pays California income tax on his or her wages, but who does not work principally in California or any other state?

## II.

Section 226 requires an employer to supply each employee, "semimonthly or at the time of each payment," a

written wage statement listing the employer's name and address; identifying the pay period; itemizing the total hours worked, applicable hourly rates, hours worked at each rate, gross and net wages earned, and any deductions taken; and disclosing other prescribed information. (§ 226, subd. (a).) Violations may result in penalties of up to $4,000 for each injured employee, as well as an award of costs and attorney's fees. (*Id.*, subd. (e)(1).)

The Ninth Circuit's first question is whether, as United argues, the plaintiff crew members fall outside the protections of section 226 because they are parties to a collective bargaining agreement entered in accordance with the Railway Labor Act. United's argument is not based on the language of section 226—which says nothing at all about collective bargaining agreements—but on the language of the transportation industry wage order, Wage Order No. 9.

Wage Order No. 9 is one of 18 wage orders promulgated by the IWC in response to the Legislature's 1913 directive to "investigate various industries and promulgate wage orders fixing for each industry" rules governing wages, hours, and working conditions. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.) The wage orders remain in effect alongside the body of law enacted by the Legislature and codified in the Labor Code; the two sources of authority establish complementary regulations governing wage and hour claims. (*Ibid.*)

Like the other wage orders, Wage Order No. 9 sets out certain wage statement requirements that overlap with (but are narrower than) the requirements of section 226. (Wage Order No. 9, § 7(B); see, e.g., Cal. Code Regs., tit. 8, §§ 11010,

subd. 7(B), 11020, subd. 7(B), 11030, subd. 7(B).)[2]  As relevant here, it also provides that, subject to certain exceptions not pertinent here, "this order shall not be deemed to cover those employees who have entered into a collective bargaining agreement under and in accordance with the provisions of the Railway Labor Act, 45 U.S.C. Sections 151 et seq."  (Wage Order No. 9, § 1(E).)

Because Ward and the other members of the certified classes have entered into such a collective bargaining agreement, it is undisputed that United need not comply with the itemized statement requirements of the wage order.  But by its terms, the wage order exemption applies only to the requirements of "this order" (Wage Order No. 9, § 1(E)); the exemption does not purport to control application of any other provision of law.  And, as already noted, section 226 itself contains no similar exemption.  United nonetheless contends we should imply one.  We reject the contention.

We begin with the text of the statute.  Section 226 does contain exemptions for several categories of workers.  (E.g., § 226, subds. (d) [personal services employees], (i) [government employees], (j) [employees who are also exempt from minimum wage and overtime].)  But the statute contains nothing like Wage Order No. 9's Railway Labor Act exemption.  This

---

[2]  For example, while both the wage orders and statute require itemization of deductions from pay, only the statute requires the employer to list gross and net wages, hours worked, and applicable hourly rates of pay.  (Compare § 226, subd. (a) items (1), (2), (4), (5), (9) with Wage Order No. 9, § 7(B).)

omission is all the more telling because section 226 does expressly reference several other IWC wage order exemptions. For example, the statute provides that an employer need not specify total hours worked for salaried employees "exempt from payment of overtime under . . . any applicable order of the Industrial Welfare Commission." (§ 226, subd. (j)(1).) The same is true for several other categories of employees exempt from payment of minimum wage and overtime under IWC wage orders. (§ 226, subd. (j)(2)(A) [administrative exemption], (B) [outside sales exemption], (D) [family member exemption], (F) [commercial fishing exemption], (G) [national service program exemption].) It would have been easy enough for the Legislature to adopt the Railway Labor Act exemption as well, but it did not. The Legislature's incorporation of some (but not all) wage order exemptions strongly suggests that any omission was intentional.

We may also look beyond the text to consider the functional relationship between the Legislature's and IWC's regulation of wage statements, but we find no basis for United's importation argument there either. Section 226, which predated the IWC wage order provision, has always been the primary source of employers' obligations to supply compliant wage statements. First enacted in 1943, section 226 was initially crafted to require only that employers provide written statements showing any deductions from employees' pay. (See Stats. 1943, ch. 1027, § 1, p. 2965.)[3] Since then,

---

[3]     The original version provided: "Every employer shall semimonthly or at the time of each payment of wages furnish each of his employees either as a part of the check, draft, or

however, the Legislature has repeatedly expanded the scope of both section 226's requirements and the remedies for noncompliance. In 1963, the Legislature amended the statute to mandate that statements include the pay period and identifying information for the employee and employer. (Stats. 1963, ch. 1080, § 1, p. 2541.) In 1976, the Legislature amended section 226 to add a damages remedy for violations of the statute. (§ 226, former subd. (b), as amended by Stats. 1976, ch. 832, § 1, p. 1900.) The Legislature would later add requirements that the statement show both gross and net wages (Stats. 1978, ch. 1247, § 3, p. 4059), hours worked (Stats. 1984, ch. 486, § 1, p. 1990) or piece-rate units earned (Stats. 2000, ch. 876, § 6, p. 6508), and any applicable hourly rates (*ibid*.). All told, the Legislature has revisited the statute more than a dozen times since 1976. (See 44 West's Ann. Lab. Code (2019 supp.) foll. § 226, p. 231.) The end result is a comprehensive statute that contains not only detailed requirements for the contents of wage statements, but also recordkeeping and inspection requirements (§ 226, subds. (a)–(c)) and extensive remedies for noncompliance, including statutory penalties recoverable by the Labor Commissioner (*id*., subd. (f)) as well as injunctive relief, damages, statutory penalties, and attorney's fees for employee claimants (*id*., subds. (e)(1), (f), (h)).

---

voucher paying the employee's wages, or separately, an itemized statement in writing showing all deductions made from such wages; provided, all deductions made on written orders of the employee may be aggregated and shown as one item." (Stats. 1943, ch. 1027, § 1, p. 2965.)

With respect to wage statement regulation, the IWC wage orders have always played a background role relative to section 226. In 1957, more than a decade after section 226 was first enacted, the IWC incorporated the then-existing version of section 226 into its wage orders, requiring that employers supply "at the time of payment of wages an itemized statement in writing showing gross wages paid and all deductions from such wages." (IWC wage order No. 9–57, § 7(b).) Later, in 1976, the IWC updated its wage orders to incorporate the additional requirements introduced by the 1963 amendments to section 226, including the requirement that a statement include the pay period and identifying information for the employee and employer. (See IWC wage order No. 9–76, § 7(B).) That was the last time the IWC altered the substance of the wage statement requirements. Although the Legislature has made many more changes to section 226 since then, the wage orders have not kept pace. Rather, the current version of the wage order still tracks the version of section 226 the Legislature adopted in 1963. (Compare Wage Order No. 9, § 7(B) with former § 226, as amended by Stats. 1963, ch. 1080, § 1, pp. 2540–2541.)

The Railway Labor Act exemption was added to the transportation industry wage order in 1976. (IWC wage order No. 9–76, § 1(D); see Wage Order No. 9, § 1(E) [carrying forward the same language without amendment].) The IWC "found that it would be difficult to enforce standards for employees crossing state lines and that the exempted employees were better protected by their collective bargaining agreements pursuant to the Railway Labor Act." (IWC, Statement of Findings by the IWC of the State of Cal. in Connection with the Revision in 1976 of Its Orders Regulating

10

Wages, Hours, and Working Conditions (Aug. 13, 1976) p. 6 (IWC 1976 Statement of Findings).)

In other Labor Code provisions, the Legislature has demonstrated its willingness to craft exemptions for employees under collective bargaining agreements when it believes such exemptions are warranted. For example, in 1970, the Legislature added just such an exception to Labor Code section 204. (Lab. Code, § 204, subd. (c) ["However, when employees are covered by a collective bargaining agreement that provides different pay arrangements [than the prompt payment deadlines imposed in § 204], those arrangements shall apply to the covered employees"]; see Stats. 1970, ch. 1237, §§ 3–4, pp. 2225–2226; Stats. 1970, ch. 1260, §§ 2–3, pp. 2279–2280.) The Legislature has done likewise in Labor Code sections 510, 512, and 514. (See Lab. Code, §§ 510, subd. (a)(2) [exempting from overtime statute work schedules "adopted pursuant to a collective bargaining agreement"], 514 [exempting from statutes regulating overtime and working hours "an employee covered by a valid collective bargaining agreement" when certain additional conditions are met]; *Gerard v. Orange Coast Memorial Medical Center* (2018) 6 Cal.5th 443, 456 ["Since 2000, the Legislature has amended [Labor Code] section 512 several times to exempt various classes of employees covered by collective bargaining agreements from the prohibition against the waiver of second meal periods for employees working more than 12 hours"; citing examples].)

Despite numerous opportunities, however, the Legislature has never followed the IWC's lead and enacted an exemption to section 226 for employees operating under a collective bargaining agreement entered under the Railway Labor Act. We see no basis for importing the Railway Labor

11

Act exemption when the Legislature itself has not chosen to do so. Given the number of times the Legislature has revisited and revised section 226 since the Railway Labor Act exemption was first promulgated in 1976, we can be sure that the Legislature's failure to adopt the exemption is not for want of attention to the statute.

Despite all this, United argues that we must import the Railway Labor Act exemption into section 226 in order to harmonize the wage order and statute. United is correct that courts must strive to harmonize the IWC's wage orders and the statutory provisions of the Labor Code where possible, just as we would strive to harmonize any two sets of legal provisions governing the same subject. (*Brinker Restaurant Corp. v. Superior Court, supra,* 53 Cal.4th at pp. 1026–1027.) But we are not persuaded that importing the wage order's Railway Labor Act exemption into section 226 is the right way to go about that task. Notwithstanding United's contrary claim, to read section 226 in accordance with its plain terms creates no necessary conflict with the IWC's choice to exempt employees covered by a relevant collective bargaining agreement from virtually all of the provisions of the transportation industry wage order. No one disputes that the exemption remains fully operative with respect to matters other than wage statements and thus continues to shield employers from wage order provisions imposing recordkeeping requirements, uniform and equipment requirements, suitable seating requirements, and the like. (E.g., Wage Order No. 9, §§ 7(A), 9, 14.) Even as to the wage order's wage statement requirements, the exemption has an important role to play insofar as it shields employers from sanctions for any violation of these requirements that might otherwise apply. (See Lab. Code, § 1199, subd. (c)

[making violation of an IWC wage order a misdemeanor].)  In short, it is entirely possible to give effect to both the plain terms of the statute and to the terms of the wage order. Because there is no necessary conflict between the two, there is no reason to harmonize them in the manner United proposes. (See, e.g., *Dicon Fiberoptics, Inc. v. Franchise Tax Bd.* (2012) 53 Cal.4th 1227, 1236–1237.)

United's argument for importing the wage order exemption into section 226 relies principally on *Collins v. Overnite Transportation Co.* (2003) 105 Cal.App.4th 171 (*Collins*), in which the Court of Appeal held that a different wage order exemption operated to exempt an employer from compliance with statutory overtime requirements.  But the statutory and regulatory context was meaningfully different for reasons thoroughly addressed in the *Collins* opinion, and *Collins* neither holds nor suggests that every wage order exemption must be read into every corresponding provision of the Labor Code in order to harmonize the two bodies of law.

The plaintiffs in *Collins* were a class of truck drivers who sought overtime compensation under the Labor Code.  In its defense, their employer invoked the so-called motor carrier exemption contained in the transportation industry wage order.  (IWC wage order No. 9–90, § 3(H); see Wage Order No. 9, § 3(L) [exempting truck drivers whose hours are regulated by the federal Department of Transportation].)  That plaintiffs' claim was an overtime claim matters, because the history of overtime regulation in California is essentially the reverse of the history of wage statement regulation:  The IWC has long had overtime rules in place pursuant to its delegated authority to regulate hours, pay, and working conditions (see, e.g., IWC wage order No. 9–52, § 3(a) [defining overtime pay

obligations]), while the Legislature is a relatively recent entrant to the field. That entry came in response to 1998 IWC wage orders that weakened overtime protections; in 1999, to reverse these changes, the Legislature codified certain minimum protections (Lab. Code, § 510, as amended by Stats. 1999, ch. 134, § 4, p. 1821; §§ 511–515, as enacted by Stats. 1999, ch. 134, §§ 5–9, pp. 1821–1825; see *Brinker Restaurant Corp. v. Superior Court, supra*, 53 Cal.4th at p. 1037), on which the plaintiff truck drivers in *Collins* then relied. But the Legislature also expressly ratified most existing exemptions to overtime protections already contained in any wage orders, including the motor carrier exemption, in newly enacted Labor Code section 515. (See Lab. Code, § 515, subd. (b) [the IWC need not revisit pre-1998 "exemption[s] from provisions regulating hours of work"].) Because the new Labor Code overtime provisions expressly ratified existing IWC exemptions, and because to conclude otherwise would work an implied repeal of a long-standing wage order provision, the *Collins* court rejected the drivers' argument that they were entitled to statutory overtime notwithstanding the motor carrier exemption. (*Collins, supra*, 105 Cal.App.4th at pp. 179–180 & fn. 4.)

Here, in contrast to *Collins*, the statutory provision at issue was not enacted to serve as an adjunct to the relevant IWC wage orders; section 226 both predated the wage statement requirements of the wage orders and has long exceeded them in its substantive and remedial scope. Unlike the statutory overtime provision at issue in the *Collins* decision, section 226 contains no indication that the Legislature intended to embrace all of the IWC exemptions wholesale; on the contrary, section 226's incorporation of

14

certain IWC exemptions (but not others) suggests a different approach. And the presumption against implied repeals that played a central role in *Collins* has no relevance here; section 226, a statute enacted in 1943, could not have impliedly repealed a wage order exemption first created in 1976. *Collins*, in short, offers no support for United's argument for importing the Railway Labor Act exemption into section 226 when the Legislature has not chosen to do so.

Finally, and in any event, United's argument fails because plaintiffs' claims relate solely to wage statement requirements that are not covered by the wage order. The wage order does not require employers to list their address or to state hours worked and applicable hourly rates, which is what plaintiffs have asked for here.[4] Even if the wage order exemption could be read to excuse compliance with section 226 to the extent its requirements overlap the wage order's, we have no basis for concluding the IWC intended to exempt, or the Legislature authorized it to exempt, employers from additional requirements *beyond* those in the wage order. In sum, we conclude the Legislature did not intend the wage order exemption to foreclose plaintiffs' section 226 claims.

---

[4] As noted, Wage Order No. 9 was last amended in 1976. The three wage statement requirements at issue in this case were added to section 226 after that time. (See Stats. 1978, ch. 1247, § 3, p. 4059 [adding employer address requirement]; Stats. 1984, ch. 486, § 1, p. 1990 [adding hours worked requirement]; Stats. 2000, ch. 876, § 6, p. 6508 [adding hourly rates requirement].)

## III.

We turn to the Ninth Circuit's second question: Whether plaintiffs are entitled to wage statements prepared in compliance with section 226 of California's Labor Code, even though they perform most of their work outside California.

### A.

In debating the coverage of section 226's wage statement requirements, the parties rely heavily on a pair of long-standing presumptions about the intended geographic reach of legislative enactments. The first of these is a presumption against extraterritoriality—that is, a presumption that state law is intended to apply only within state borders. Of course, legislatures can, and do, regulate beyond their territorial borders in appropriate circumstances. (*Skiriotes v. Florida* (1941) 313 U.S. 69, 77–79; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 565–566 (*Tidewater*); *People v. Weeren* (1980) 26 Cal.3d 654, 666; cf., e.g., Rest.4th Foreign Relations Law, § 402 [describing certain recognized bases for the United States to regulate persons and conduct outside its territory].) But courts ordinarily will not give extraterritorial effect to legislative enactments absent an affirmative indication that such was the Legislature's intent. (See, e.g., *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1207 (*Sullivan*); *North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4; cf. *EEOC v. Arabian American Oil Co.* (1991) 499 U.S. 244, 248 [describing similar presumption against extraterritoriality governing the acts of Congress].) The rule, which reflects an assumption that a legislature generally legislates with domestic concerns in mind (*Foley Bros. v. Filardo* (1949) 336 U.S. 281, 285), also serves the incidental

purpose of avoiding unintended conflicts with other sovereigns (*North Alaska Salmon Co.*, at p. 5; see *Arabian American Oil Co.*, at p. 248; *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1059–1060, fn. 20).

The presumption against extraterritoriality has a mirror-image relative in the form of a presumption in favor of *intraterritorial* application. Employing this presumption, courts ordinarily interpret California statutes to apply to conduct occurring anywhere within California's borders, absent evidence a more limited scope was intended. (See, e.g., *Tidewater*, *supra*, 14 Cal.4th at p. 578; *People v. Weeren*, *supra*, 26 Cal.3d at pp. 669–670.)

The parties dispute how these presumptions apply in this case. United argues that to apply any provision of California labor law to crew members who work primarily outside California would constitute an extraterritorial application of California law, which we presume the Legislature did not intend. The crew members, by contrast, implicitly rely on the mirror-image presumption: They argue that because they live in California and are paid in California (as evidenced by the fact they pay California income taxes), requiring United to send them California-compliant wage statements would not violate the presumption against extraterritoriality but would instead constitute a run-of-the-mill intraterritorial application of state law.

There is an element of truth to both views, which suggests that framing the issue solely as whether the crew members' section 226 claims violate the presumption against extraterritoriality is not a particularly helpful way to approach the issue in this case. In our modern, interconnected economy,

many legal transactions and relationships span multiple jurisdictions. That goes double for the claims of the employees here, whose very livelihoods consist of moving back and forth across state and international borders. From any given state's perspective, these employees' claims may well have both extraterritorial and intraterritorial elements. Unless we are prepared to conclude that *any* extraterritorial effect at all is sufficient to bar application of California law, or, conversely, that *any* intraterritorial effect at all is sufficient to justify it, we cannot resolve this case based on territorial presumptions alone.

We made this very point in *Tidewater*, *supra*, 14 Cal.4th 557, in which we resolved a dispute over the application of IWC wage order overtime provisions to maritime workers employed in the Santa Barbara Channel. We there resisted the employers' argument that the reach of the IWC's wage orders was necessarily limited by California's territorial boundaries. "In some circumstances," we noted, "state employment law explicitly governs employment outside the state's territorial boundaries. (Lab. Code, §§ 3600.5, 5305 [California workers' compensation law applies to workers hired in California but injured out of state].) The Legislature may have similarly intended extraterritorial enforcement of IWC wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day. On the other hand, the Legislature may not have intended IWC wage orders to govern out-of-state businesses employing nonresidents, though the nonresident employees enter California temporarily during the course of the workday." (*Tidewater*, at pp. 577–578.) We

therefore declared ourselves "not prepared . . . to hold that IWC wage orders apply to *all* employment in California, and *never* to employment outside California." (*Id.* at p. 578.)

Because we ultimately concluded the employees in *Tidewater* did work exclusively in California, we had no need to press the issue further. But since *Tidewater*, a considerable body of out-of-state case law has done just that. Courts have concluded, for example, that in some circumstances one state's law may well govern work performed in another state—or, conversely, that another state's laws do not govern work performed partly in that state.[5]

---

[5]  See, e.g., *Dow v. Casale* (2013) 83 Mass.App.Ct. 751, 756 [989 N.E.2d 909, 913] (Massachusetts wage law applied to traveling salesperson of Massachusetts employer, even though salesperson resided in Florida and performed work in more than 19 states); *Solouk v. European Copper Specialties, Inc.* (S.D.N.Y., May 2, 2019, No. 14cv8954 (DF)) 2019 U.S.Dist. Lexis 81267, pp. *47–*50 (New York labor law could apply to work performed in New Jersey incident to public works project in Manhattan); *Heng Guo Jin v. Han Sung Sikpoom Trading Corp.* (E.D.N.Y., Sept. 21, 2015, No. 13-CV-6789 (CBA) (LB)) 2015 U.S.Dist. Lexis 125961, pp. *23–*26 (New York minimum wage and overtime law might apply to New York-based delivery truck driver who made deliveries both in and out of state); *Hernandez v. NJK Contractors, Inc.* (E.D.N.Y., May 1, 2015, No. 09-CV-4812 (RER)) 2015 U.S.Dist. Lexis 57568, pp. *121–*122 (presumption against extraterritorial application of New York labor law would not preclude New York-based workers' recovery under that law for travel time to and from job site in neighboring state); *Bostain v. Food Exp., Inc.* (2007) 159 Wn.2d 700, 712–713 [153 P.3d 846, 852] (Washington overtime law applied to Washington-based interstate truck driver, even when driving out of state).

In our most recent discussion of this issue, we held that California's overtime laws applied to nonresident employees of a California corporation who worked in California for "full days and weeks" at a time. (*Sullivan*, *supra*, 51 Cal.4th at p. 1201.) In so holding, we rejected the employer's argument that the overtime laws of the employees' home state necessarily followed them into California, creating a conflict with California law. (*Id.* at p. 1198.) But we did not hold that the employment laws of another state can *never* apply to work performed in California. Nor, for that matter, did we hold either that California's employment laws *always* apply to every minute or hour of work performed in this state or that these laws *never* apply when work is performed in part out of state. (See *id.* at pp. 1199–1200 [discussing *Tidewater*, *supra*, 14 Cal.4th 557].) Finally, we did not suggest the same conclusion necessarily applies to every aspect of wage and hour law. While we held California's overtime law does apply to "full days and weeks of work performed here by nonresidents," we declined to assume California law would also govern "the content of an out-of-state business's pay stubs, or the treatment of its employees' vacation time." (*Sullivan*, at p. 1201.) In such cases, California may well have a lesser interest in applying its own laws, and the laws of another jurisdiction might instead control. (*Ibid.*)

From these cases, we derive two general lessons. First, when it comes to the regulation of interstate employment, it is not sufficient to ask whether the relevant law was intended to operate extraterritorially or instead only intraterritorially, because many employment relationships and transactions will have elements of both. The better question is what kinds of California connections will suffice to trigger the relevant

provisions of California law. And second, the connections that suffice for purposes of one statute may not necessarily suffice for another. There is no single, all-purpose answer to the question of when state law will apply to an interstate employment relationship or set of transactions. As is true of statutory interpretation generally, each law must be considered on its own terms.

## B.

With this background in mind, we consider the geographic scope of the labor protection in section 226. Again, the statute regulates the information an employer must give its employees when it pays wages. "An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee" in connection with each wage payment "an accurate itemized statement in writing" disclosing nine categories of information, including the pay period, hours worked, applicable hourly rates, gross and net wages earned, and any deductions taken. (§ 226, subd. (a).) Section 226 contains no language specifying its intended geographic scope. As earlier noted, the statute excludes certain employers, including most government employers (*id.*, subd. (i)), and certain employees, including domestic childcare providers and others providing some personal services (*id.*, subd. (d)). There are, however, no express inclusions or exclusions based on any particular set of geographic considerations.

To gain insight into the question, then, we consider section 226's aims and its role in the surrounding statutory scheme. The core purpose of section 226 is "to ensure an employer 'document[s] the basis of the employee compensation payments' to assist the employee in determining whether he or

she has been compensated properly." (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 390, quoting *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 574; see *Henry M. Lee Law Corp. v. Superior Court* (2012) 204 Cal.App.4th 1375, 1388 [the statute vindicates the public policy in favor of full and prompt payment of earned wages]; Dept. of Industrial Relations, DLSE Opn. Letter No. 2002.05.17 (May 17, 2002) p. 3 [§ 226 "is designed to provide the employee with a record of hours worked, and to assist the employee in determining whether he [or she] has been compensated properly for all of his or her hours worked"].) Section 226 is part of a matrix of laws intended to ensure workers are correctly and adequately compensated for their work. From this we reasonably infer that the relevant geographic connection for purposes of determining what state law applies is where that work occurs.

The increment of work covered by section 226 is also relevant to the inquiry. Unlike, for example, the overtime laws at issue in *Sullivan*, section 226 does not operate at an hourly, daily, or even weekly level. (See § 226, subd. (a).) Section 226 does not dictate what the employee is paid for any given period of time, but instead how the pay will be documented, requiring that certain information be provided to the employee each pay period (typically a period of about two weeks). (§ 226, subd. (a); see Lab. Code, § 204, subd. (a).) Section 226 appears to contemplate that the information supplied will be comprehensive, embracing all hours, wages, and deductions for the given pay period (see, e.g., § 226, subd. (a), item (2) ["total hours worked"], item (4) ["all deductions"], item (6) ["the inclusive dates of the period for which the employee is paid"], item (9) ["all applicable hourly rates"]), and thus that a single

state's law will govern what information must be furnished to the employee about wages earned over the course of that period. While *Sullivan* raises the possibility that an employee's substantive compensation might be governed by different states' laws depending on where and how much the employee worked during a given pay period, the wage statement statute does not admit of the same possibility. The statute does not appear to contemplate, for example, that an employee who works in 10 different jurisdictions over the course of a single pay period should receive 10 different wage statements, each prepared according to the laws of a different state.[6] Any work-location-based test for section 226 must reconcile the possibility that some employees may perform their work in more than one jurisdiction with the legislative desire for a single statement documenting employee pay.

Based on these considerations, United proposes we adopt a "job situs" test, borrowing a phrase from federal case law interpreting a provision of federal labor law. (See *Oil Workers v. Mobil Oil Corp.* (1976) 426 U.S. 407, 414 (*Oil Workers*) [under federal labor law, "it is the employees' predominant job situs rather than a generalized weighing of factors or the place of hiring" that determines whether a state's right-to-work law may apply].) Under this test, a jurisdiction's labor laws would apply to workers who perform all or most of their work in the jurisdiction. This makes sense for section 226, United says, because the statute's primary concern is with the general

---

[6] Nor does Ward propose such an interpretation. The plaintiffs in *Oman v. Delta Air Lines, Inc., supra*, ___ Cal.5th ___, do, however, and we address the argument in that case.

regulation of the payment of employees within the context of an established employment relationship, and "the center of [that] relationship is the job situs, the place where the work that is the very *raison d'être* of the relationship is performed." (*Oil Workers*, at p. 417.)

We agree with the basic premise of this argument: Application of section 226 logically depends on whether the employee's principal place of work is in California.[7] That test is certainly satisfied when the employee spends the majority of his or her working hours in California. But this case demonstrates why that answer is only a partial one. These plaintiffs, like many transportation workers, do not perform the bulk of their work in any one state.[8] United argues that that is the end of the story; they are not entitled to the protections of California wage statement law. But if every state were to adopt the same rule, then many transportation-

---

[7] This aligns section 226 with the many Labor Code provisions that by their terms reflect an overarching legislative concern with regulating work performed in this state, as opposed to elsewhere. (See, e.g., Lab. Code, §§ 1173, 1174, 1193.5.)

[8] Neither *Tidewater* nor *Sullivan* dealt with such a circumstance. In *Tidewater*, we determined that the employees worked exclusively in California. (*Tidewater, supra,* 14 Cal.4th at pp. 578–579.) And in *Sullivan*, although the employees worked in various states, for the specific period of time at issue under the laws in question—days or weeks under the overtime laws—they worked entirely in California. (*Sullivan, supra,* 51 Cal.4th at p. 1196.) Here, the relevant time frame is a pay period, and in every pay period these employees not only worked in many states, but also did not work most of their time in any single state.

sector employees—from interstate truck drivers to train conductors to the airline employees here—would not be entitled to the protections of *any* state's law:  Effectively, because these employees work in many jurisdictions, they would receive the protections of none.

That conclusion would conflict with the approach we traditionally have taken to the employee protections of the Labor Code.  California's wage and hour laws are remedial in nature and must be liberally construed in favor of affording workers protection.  (*Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 953; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1026–1027; *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.)  But equally important, to deny section 226's protections to interstate transportation workers would conflict with what we know of the history preceding section 226's 1943 enactment (Stats. 1943, ch. 1027, § 1, p. 2965), which reveals that this class of workers was the inspiration for the new law and its primary intended beneficiary.  Specifically, the history shows the measure was introduced at the behest of railroad employees who, receiving checks that showed only the net amount they were paid, had no way to verify whether this amount was correct.  (See, e.g., Sen. Gannon, author of Assem. Bill No. 295 (1943 Reg. Sess.) letter to Governor Earl Warren, May 13, 1943, p. 1 (Gannon Letter) ["A.B. 295 was introduced by me at the request of thousands of employees of the Southern Pacific Company"]; James H. Anderson, Dining Car Employees Local 582 and Credit Union Ltd., letter to Governor Earl Warren in support of Assem. Bill No. 295 (1943 Reg. Sess.) May 21, 1943; Charles Elsey, The Western Pacific Railroad Company, letter to Governor Earl Warren in opposition to

Assem. Bill No. 295 (1943 Reg. Sess.) May 18, 1943.) The author of the bill represented that these workers were among "the comparatively few working men in California" who did not already receive such statements. (Gannon Letter, at p. 2.) This background suggests the Legislature intended to extend section 226's protections—within reason—to workers who perform at least some of their work in California, even if they do not perform all or most of their work in California.

To determine how far these protections extend, we return to the central insight that has long guided courts seeking to discern the geographic scope of legislative enactments: that the Legislature ordinarily does not intend for its enactments to create conflicts with other sovereigns. We can infer from this that the Legislature intended for section 226 to apply to workers whose work is not performed predominantly in any one state, provided that California is the state that has the most significant relationship to the work. For interstate transportation workers and others who do not work more than half the time in any one state, we conclude this principle will be satisfied if the worker performs some work here and is based in California, meaning that California serves as the physical location where the worker presents himself or herself to begin work. This is not a new concept in labor law; this is, in fact, the same general test that has been applied for some decades in the field of unemployment insurance, where the Legislature has paid focused attention to the problem of coverage for employees whose work is not localized in any one

state. (See Unemp. Ins. Code, §§ 602–603.)[9] Applied to section 226, it means that workers are covered if they perform the majority of their work in California; but if they do not perform the majority of their work in any one state, they will be covered if they are based for work purposes in California. This familiar test supplies clarity and certainty for employers and employees, while also appropriately balancing the Legislature's weighty interest in the protection of California workers, including interstate transportation workers, with similarly

---

[9] More than half a century ago, to "avoid conflicts and overlapping coverage between States with respect to the service of a single individual for a single employer performed in two or more States," the United States Department of Labor described a series of sequential considerations for determining an employee's place of work for purposes of unemployment insurance coverage. (U.S. Dept. of Labor, Manual of State Employment Security Legislation (1950) p. C–12; see *id.* at pp. 10–11.) Drawing on this guidance, the Legislature adopted a test that reaches both employees whose work occurs exclusively or primarily in California and those whose work is not localized in any one state, but who do some work in California and have their base of operations in the state. (See Unemp. Ins. Code, §§ 602–603.)

The test identifies additional considerations to consult for employees whose work is not localized in any state and who have no base of operations. (Unemp. Ins. Code, § 602, subd. (b).) Because plaintiffs here appear to have a base of operations in a state where they perform some of their work, we need not express any view as to whether these or other similar considerations should be consulted to determine section 226's application for employees who are neither localized nor have any established base of operations in any state.

weighty considerations of interstate comity and avoidance of conflicts of laws.[10]

## C.

In adopting this approach, we reject several alternative approaches proposed by the parties. First, United suggests our interpretation of section 226 should take into account the fact that plaintiffs perform most of their work in airspace subject to the exclusive jurisdiction of the federal government. (See 49 U.S.C. § 40103(a) ["The United States Government has exclusive sovereignty of airspace of the United States"].) United's argument relies heavily on *Oil Workers*, *supra*, 426 U.S. 407, which interpreted a federal labor law authorizing union or agency shops but allowing individual states to enact "right-to-work" laws prohibiting such shops. The specific question in *Oil Workers* concerned how this law should apply to employees who spent the majority of their time on oil tankers on the high seas. (*Id.* at p. 420.) There, applying the "job situs" test, the high court concluded no state "right-to-work" law applied, and the authority to enter an agency shop agreement was instead governed exclusively by federal law. (*Id.* at pp. 420–421.) United argues that here, too, no state wage statement law should apply to workers who spend the majority of their time in federally regulated airspace, and the

---

[10] Consistent with our statute-by-statute approach to determining the scope of employment protections (*Sullivan*, *supra*, 51 Cal.4th at p. 1201), what we say is specific to section 226 and would not necessarily apply to the state's minimum wage, equal pay, or antiharassment laws, for example.

matter should instead be left to federal law (which currently imposes no wage statement requirements).

But this case differs from *Oil Workers* because that case concerned the proper interpretation of a federal law that evinced the federal government's independent interest in regulating the subject of the employment law at issue. (*Oil Workers*, *supra*, 426 U.S. at pp. 420–421.) There was no particular reason to conclude Congress would have been averse to a test that created an occasional state law vacuum, for in its absence, federal law would continue to apply. Here, in contrast, we have reason to believe the Legislature would have been concerned about providing no protection to employees who work in California, with whom California has the most significant relationship to the employee's work, and for whom no other law would otherwise apply. And unlike in *Oil Workers*, which involved the potential application of state law concerning union shop agreements, a matter also regulated under federal law (see 29 U.S.C. § 164(b); *Oil Workers*, at p. 409), Congress has not seen fit to enter the area of wage statement regulation.

Implicit in United's argument is the idea that the federal government's interests, too, should factor into our consideration of which jurisdiction has the most significant connection to the employment relationship for purposes of applying section 226, at least when it comes to interstate transportation workers who perform most of their work in the air instead of on the ground. But as the Legislature that enacted the statute undoubtedly understood, in our system of federalism, federal law and state law ordinarily coexist. When the two overlap, tensions between them are resolved not by interstate comity and choice of law principles but by the

supremacy clause and preemption principles. If the federal government prefers that no state law on a particular subject apply to workers who spend their time primarily in federal airspace, it can legislate and preempt. But in the absence of any federal action, we have no reason to think applying California law would encroach on federal prerogatives, nor any reason rooted in considerations of comity to conclude the Legislature would have preferred that workers based in California go unprotected by section 226.

Ward, for his part, contends that section 226 should apply to employees who perform significant work in California and are "headquartered" here. But Ward also relies on a federal case, *Bernstein v. Virgin America, Inc.* (N.D.Cal. 2017) 227 F.Supp.3d 1049, to argue that three additional factors should play a role: where the employee resides, pays taxes, and receives wage payments. *Bernstein* adopted this multifactor test based on its reading of *Sullivan*, *supra*, 51 Cal.4th 1191. It inferred from *Sullivan* that in deciding whether a state labor protection applies, a court should consider, inter alia, where work was performed, where pay was received, where the employer and employee resided, and whether work outside the state was of a temporary nature. (*Bernstein*, at p. 1060.) *Sullivan*, however, did not establish an all-purpose multifactor test of this sort. It considered only "whether California's *overtime law* applies to work performed here by nonresidents" (*Sullivan*, at p. 1196, italics added) and answered that question by carefully construing the specific statute at issue and determining whether that statute should apply to the plaintiffs' work (*id.* at pp. 1197–1198), rejecting any inference that the conclusion it reached should extend to

other statutes (*id.* at p. 1201), each of which would require their own statutory analyses.

Under section 226, we decline to place weight on the three additional factors—residence, receipt of wages, and payment of taxes—Ward proposes. To begin with, the extra factors he cites beyond residence are entirely derivative of the underlying fact of residence: "The California [employees'] receipt of wages and wage statements in California is simply a consequence of the [employees'] California residency if their wage statements are mailed to their mailing addresses in California. Similarly, California [employees'] payment of California income taxes . . . is also a result of the [employees'] California residency." (*Shook v. Indian River Transport Co.* (E.D.Cal. 2017) 236 F.Supp.3d 1165, 1172.)

Nor is residence alone significant. We have already established that being a nonresident does not exclude an employee from the state's labor protections, as the employer in *Sullivan, supra,* 51 Cal.4th 1191, had argued. We looked for instruction to Labor Code section 1171.5, subdivision (a), which guarantees that "[a]ll protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." We acknowledged that the provision had been adopted "to protect undocumented workers from sharp practices." (*Sullivan*, at p. 1197, fn. 3.) We rejected, however, the inference that the Legislature sought only to protect undocumented workers from outside the United States: "Section 1171.5 . . . cannot reasonably be read as speaking only to undocumented workers, given that it was drafted and

codified as a general preamble to the wage law and broadly refers to 'all individuals' employed in the state. (*Id.,* subd. (a).) More importantly, no reason exists to believe the Legislature intended to afford stronger protection under the employment laws to persons working illegally than to legal nonresident workers." (*Sullivan,* at p. 1197, fn. 3.) We interpreted section 1171.5 as expressing an intent to afford all those working in California the benefit of the state's worker protections, without regard to residence.

The proposition Ward argues here—residence should imply protection—is the inverse of the proposition the employer advanced and we rejected in *Sullivan, supra,* 51 Cal.4th 1191 (that nonresidence implies nonprotection). Just as Labor Code section 1171.5 weighs against finding nonresidence disqualifying for purposes of applying state labor protections, it also weighs against finding residence to be the sine qua non for purposes of *applying* those protections. The Legislature expressed a clear intent not to have the availability of labor protections turn on legal residency in the state. And if we were to read section 1171.5 more narrowly as extending California law without regard to residence for those working inside the state, while not speaking to the relevance of residence for those living here but who work primarily out of state, we would still need to find some basis for concluding the Legislature intended to extend section 226 to the latter category of employees. Application of section 226 to those who work primarily outside the state, based only on their choice to reside here, would create overlap and potential conflict-of-laws concerns when California law and the law of the state in which the employee primarily worked differed. The test we apply instead, limiting a California employment statute's scope to

circumstances in which California's relationship to the work is more significant than any other state's, avoids such concerns.

Ward's proposed application of section 226 based on residence would also create significant complications for some out-of-state employers. For example, the statute requires that "a copy of the [wage] statement and the record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location *within the State of California*." (§ 226, subd. (a), italics added.) The requirement that records be maintained within California, and hence within the geographic area over which the Department of Labor Standards Enforcement and other state agencies have jurisdiction, doubtless is intended to facilitate investigation and enforcement of compliance.[11] For a business that operates, for instance, only in Stateline, Nevada, this would require the establishment of a separate records depot in California if, for reasons beyond the employer's control, one or more employees elected to reside in the immediately adjacent City of South Lake Tahoe, on the California side of the same community. If an employee principally works in and is based

---

[11] This language was added in 1987. (Stats. 1987, ch. 976, § 1, p. 3266.) It mirrors similar language that has appeared in the IWC's wage orders since 1968. (See, e.g., IWC wage order No. 9–68, § 7(c); Wage Order No. 9, § 7(C).) Explaining the requirement, the IWC has said, "With regard to the meaning of 'central' location, the [IWC] will allow required records to be kept together at any single location within California, provided that they are available to the Division [of Labor Standards Enforcement]. Enforcement experience has proved this requirement to be necessary." (IWC 1976 Statement of Findings, *supra*, p. 12.)

out of Nevada, and only incidentally works in California, Nevada law governing wage statements should apply regardless of whether the employee chooses to live across the border in California, receive pay here, and pay taxes here. On the other hand, if an employee principally works in California out of headquarters here, with some incidental work in Nevada, section 226 should apply, notwithstanding that the employee may elect to live in Nevada. We decline Ward's invitation to make employees' residence a focus of the test for determining whether an employer must furnish wage statements that comply with California law.

Finally, Ward proposes section 226 should apply, whether or not an employee works principally in California, so long as the "conduct which gives rise to liability . . . occurs in California." (*Diamond Multimedia Systems, Inc. v. Superior Court*, *supra*, 19 Cal.4th at p. 1059.) Ward asserts that the conduct supporting liability under section 226 is the issuance of a noncompliant wage statement, and that for the plaintiff classes this occurred in California.

There are two difficulties with this argument. First, Ward supplies no citation, and upon our independent review we discern nothing in the record, to support the assertion that United, a corporation incorporated and headquartered elsewhere, prepares and issues wage statements in California (as opposed to such statements simply being received here by employees who may reside here). Second, a test based on the location of the conduct giving rise to liability is hopelessly indeterminate when applied to section 226 and similar wage and hour protections. Is liability based on preparation of a noncompliant statement, in State X, where an employer may house its payroll department? Is it in State Y, where the

statement is received? Or is it in State Z, where corporate headquarters are located and the decision as to the statement's contents is made? For claims that arise from allegedly inadequate wage payments, does the conduct supplying liability occur where decisions are made, where payments are issued, or where payments are received, e.g., wherever an employee may have a bank account for direct deposit purposes? Looking to the location where the conduct supporting liability occurred does not provide a workable test in this context.

Instead, to determine whether section 226 applies, courts should consider in the first instance whether the employee works the majority of the time in California, or in another state. For employees, like those here, who do not work principally in any one state, a court should consider secondarily whether the employee has a definite base of operations in California, in addition to performing at least some work in the state for the employer. Thus, if a pilot or flight attendant has a designated home-base airport, section 226 would apply if that airport is in California, and not if it is elsewhere. The remaining factors mentioned in the Ninth Circuit's question—employer location, employee residence, receipt of pay, and payment of taxes—are not pertinent.

## IV.

We answer the Ninth Circuit's questions as follows:

(1) The Railway Labor Act exemption in Wage Order No. 9, section 1(E), does not bar a wage statement claim brought under section 226 by an employee who is covered by a collective bargaining agreement.

(2) Section 226 applies to wage statements provided by an employer if the employee's principal place of work is in

California. This test is satisfied if the employee works a majority of the time in California or, for interstate transportation workers whose work is not primarily performed in any single state, if the worker has his or her base of work operations in California.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Ward v. United Airlines, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S248702
**Date Filed:**  June 29, 2020
_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Jackson Hanson, Jeffrey C. Jackson, Kirk D. Hanson; Esner, Chang & Boyer, Stuart B. Esner and Joseph S. Persoff for Plaintiffs and Appellants.

Mastagni Holstedt, David E. Mastagni and Isaac S. Stevens for Dan Goldthorpe, James Donovan, Chris Bennett, James Isherwood and David Vincent as Amici Curiae on behalf of Plaintiffs and Appellants.

O'Melveny & Myers, Robert Siegel, Adam P. KohSweeney and Susannah K. Howard for Defendant and Respondent.

Jones Day, Douglas W. Hall, Shay Dvoretzky and Vivek Suri for Airlines for America as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stuart B. Esner
Esner, Chang & Boyer
234 East Colorado Blvd., Suite 975
Pasadena, CA 91101
(626) 535-9860

Kirk D. Hanson
Jackson Hanson, LLP
2790 Truxton Rd., Suite 140
San Diego, CA 92106
(619) 523-9001

Adam P. KohSweeney
O'Melveny & Myers LLP
2 Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
(415) 984-8700