Filed 12/1/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA STATE OF CALIFORNIA

| | |
|---|---|
| JULIE GUNTHER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALASKA AIRLINES, INC.,<br><br>    Defendant and Appellant. | D076762, D077313<br><br><br>(Super. Ct. No.<br>37-2017-00037849-CU-OE-NC) |

CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Affirmed in part, reversed in part and remanded.

Jones Day, Matthew J. Silveira, Shay Dvoretzky, Anthony J. Dick and Elizabeth G. Bentley for Defendant and Appellant.

Law Offices of Alexander M. Schack, Alexander M. Schack, Natasha N. Serino and Shannon F. Nocon for Plaintiff and Respondent.

DLA Piper, Mary Dollarhide, Julie Dunne, Stanley J. Panikowski and Matthew Riley as Amicus Curiae on behalf of California Employment Law Council.

---

\*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts B and C of the discussion.

MoloLamken, Jeffrey A. Lamken, Emily K. Damrau as Amici Curiae on behalf of Airlines for America and International Air Transport.

California law requires employers to provide wage statements containing certain information, including the applicable hourly wage rates, and the number of hours worked by the employee, and says workers must be able to "promptly and easily determine" that information. (Lab. Code, § 226, subds. (a) & (b).)[1] In *Ward v. United Airlines, Inc.* (2020) 9 Cal.5th 732 (*Ward I*), a group of airline pilots and flight attendants who perform duties across the country, sued their employer alleging that it failed to provide wage statements compliant with subdivision (a) of section 226 (hereafter, § 226(a)). (*Ward I*, at p. 741.) The California Supreme Court explained that these employees are entitled to section 226(a)-compliant wage statements if California qualifies as the employee's principal place of work. "For pilots, flight attendants, and other interstate transportation workers who do not perform a majority of their work in any one state, this test is satisfied when California serves as their base of work operations, regardless of their place of residence or whether a collective bargaining agreement governs their pay." (*Ward I*, at p. 740.)

The plaintiffs in this case are flight attendants who alleged that their employer, Alaska Airlines, Inc. (Alaska), failed to provide section 226(a)-compliant wage statements. They sought penalties under the Labor Code Private Attorneys General Act of 2004 (PAGA) (§ 2699 et seq.). After a bench trial, the trial court concluded that section 226(a) applied to the flight attendants because their employment is based in California and Alaska's

_____

[1]    Undesignated statutory references are to the Labor Code.

2

wage statements did not comply with section 226(a). The court found Alaska liable for over $25 million in heightened penalties under section 226.3 of PAGA. In a postjudgment order, the court awarded Gunther attorney's fees.

Notwithstanding the implications of *Ward I,* in this appeal Alaska contends that section 226(a) cannot be applied to the flight attendants because it is preempted by federal law. Alaska also raises multiple challenges to PAGA penalties, including that the trial court erred in awarding heightened penalties under section 226.3 of PAGA.

In the published portion of this opinion, we reject Alaska's argument that application of section 226 is preempted by federal law and affirm the trial court's determination that the flight attendants in this case are entitled to section 226(a)-compliant wage statements. We conclude, however, that the trial court erred in awarding heightened penalties under section 226.3 because the plain language of the statute provides that heightened penalties apply only where the employer fails to provide wage statements or fails to keep required records, which is not the situation here. Accordingly, we reverse the penalties awarded under section 226.3 and remand the matter to the trial court to determine the penalty amount under section 2699, subdivision (f)(2) of PAGA. We also conclude that, on this record, reversal of the penalty award does not require vacation of the attorney's fees award. In the unpublished portion of this opinion, parts B and C, we reject Alaska's defenses to the application of section 226(a).

FACTUAL AND PROCEDURAL BACKGROUND

As of November 2018, Alaska employed 1,181 California-based flight attendants.[2] Flight attendants who are based in California are not required to reside in California, and it is very common for flight attendants to commute by airplane from their residence to their base. From August 2016 through March 2019, 22 percent of California-based flight attendants did not reside in California.

Flight attendant employment is governed by a collective bargaining agreement between Alaska and the Association of Flight Attendants-CWA (AFA), negotiated under the Railway Labor Act (RLA) (45 U.S.C. §§ 151–165, 181–188), that took the parties three years to negotiate.[3] Flight attendants are currently compensated through a method called trips per pay (TFP), adopted from another airline. The agreement defines TFP as the "[u]nit of pay based on point-to-point mileage outlined in Section 21.E [TFP Calculation]." Alaska and AFA negotiated this payment method in 1994 after contentious negotiations.[4]

Plaintiff Julie Gunther is a flight attendant who works for Alaska. Gunter lives in San Diego, California and her employment with Alaska is

_____

[2]    The parties use the terms "domicile" and "base" interchangeably to describe "where a flight attendant is assigned" and where flight attendants "generally start[ ] and end[ ] their trips." In this opinion we refer to where a flight attendant is assigned or begins or ends a trip as the "base" and where flight attendants live as their "residence."

[3]    The AFA is an international organization that represents about 20 airlines and is the bargaining group that represents flight attendants.

[4]    Flight attendant pay structure is incredibly complex and is not necessarily related to the number of hours worked. We do not delve into the details of the flight attendant pay structure because these details are not relevant to the resolution of the issues on appeal.

4

based in San Diego. Alaska is headquartered in the State of Washington; it flies across the United States and internationally. In September 2017, Gunther sent a letter to Alaska and the California Labor and Workforce Development Agency (LWDA) alleging that Alaska violated the Labor Code and Business and Professions Code, and notifying them of her intent to pursue civil penalties under PAGA. Gunther then filed this representative action as an individual and on behalf of all California-based Alaska flight attendants (collectively, aggrieved employees) employed from October 2016 to the present because she believed that she and other flight attendants should be able to "decode what [we are] getting paid."

Gunther testified at trial that in reviewing her wage statements she is unable to determine (1) the number of TFP earned per pay period, (2) the rate of pay she received per TFP, (3) the number of hours she worked each month, (4) the number of hours worked per pay period, or (5) the rate of pay received per hour worked. Although a wage statement she received listed the total number of hours she worked in a particular month as 568, this translated to about 18 hours per day. Gunther stated she could not work that number of hours each month and she knew no flight attendants who worked this number of hours per month.

After a bench trial, the trial court found that Alaska's wage statements failed to state basic information required by section 226 including (1) total hours worked by the employee, (2) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, and (3) the corresponding rate of pay for each. (§ 226(a)(2), (3) and (9).) The court awarded $4,000 in statutory penalties to Gunther (§ 226, subd. (e)) and $25,010,158 in PAGA penalties under section 226.3. The trial court rejected Alaska's argument that it is impossible for it to comply with section 226 and

5

ordered equitable relief requiring that Alaska provide section 226 compliant wage statements to its California-based flight attendants.[5]  The trial court subsequently awarded Gunther $944,860 in attorney's fees.  Alaska appealed from the judgment and attorney's fees award.  We granted the parties' joint motion to consolidate the appeals.[6]

DISCUSSION

A. *Section 226 Applies to the Aggrieved Employees*

The trial court concluded that because all the flight attendants who were the subject of Gunther's PAGA claim were based in California, these individuals were protected by section 226.  In so holding, the trial court rejected Alaska's "attempt to graft a more rigid mathematical bright-line onto the flexibility provided" in two earlier California Supreme Court decisions, stating that "the precise details of where each flight attendant spends his or

---

[5]     In rejecting Alaska's impossibility defense the trial court stated:  "The Court finds that it is *possible* for Alaska to comply with Section 226.  Whether such compliance can be done within Alaska's existing [payroll] system, whether it will require Alaska to find an alternative payroll system, or whether it will require Alaska to have a new payroll database built from scratch, this Court **FINDS** that the evidence produced at trial does *not* establish that it is 'impossible' for Alaska to comply with Section 226."  Alaska did not appeal from this portion of the judgment.  Accordingly, the practical aspect of how Alaska will comply with this portion of the judgment is not before us.

[6]     We granted the applications of Airlines for America and the International Air Transport Association (together, Airlines) and California Employment Law Council (CELC) to file amicus curiae briefs on behalf of the Alaska.  We also allowed all parties to file answers to the amicus curiae briefs and invited the parties to address the impact of *Ward I, supra*, 9 Cal.5th 732, its companion case, *Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762 (*Oman*), and *Ward v. United Airlines, Inc.* (9th Cir. 2021) 986 F.3d 1234 (*Ward II*) on the issues presented in this action.

6

her time on each and every trip sequence become[s] less relevant" because each flight attendant always begins and ends a trip sequence in the state where the flight attendant is based. It also determined that Alaska's wage statements violated section 226(a)(2), (3), and (9) by failing to state the total hours worked, the number of piece-rate units earned, and the corresponding rate of pay for each. The court then rejected Alaska's affirmative defenses under the dormant Commerce Clause, RLA and Airline Deregulation Act (Deregulation Act) (49 U.S.C. § 41713(b)(l)).

On appeal, Alaska does not contest the trial court's finding that its wage statements do not contain the basic information required by section 226(a)(2), (3) and (9). It initially argued that California's wage statement rules do not apply to flight attendants who, like Gunther, spend the vast majority of their time working in federal airspace and in other states for an out-of-state employer, regardless of whether they happen to begin and end their flight pairings in California. Alaska's reply brief, filed after our high court decided *Ward I* modified its position to contend that California law does not apply *automatically* to every wage statement issued to every California-based flight attendant. It now maintains that Gunther must analyze each pay period for each flight attendant to determine if the flight attendant (1) worked the majority of the time in another state, or (2) whether the law of another jurisdiction might instead control if that jurisdiction has a greater interest in applying its own laws. Based on these contentions, Alaska argues that the judgment must be vacated and Gunther's individual claims remanded for retrial because the trial court did not properly consider and apply either of these two principles. It contends that on remand, the parties must conduct additional discovery examining where flight attendants worked during different pay periods, and Gunther bears the burden of presenting

7

evidence showing that all California-based flight attendants did not work most of the time in another state in any pay period. It also asserts that the PAGA claims must be dismissed as "unmanageable" because an individualized inquiry would be required for the over 1,000 flight attendants for whom Gunther is seeking to collect penalties.[7]

Gunther disagrees with Alaska's reading of *Ward I*, *supra*, 9 Cal.5th 732. According to Gunther, the trial court correctly applied section 226 to the aggrieved employees because the evidence established that they are based in California, do not work primarily in any single state, and perform work during every trip sequence in California. We agree with Gunther.

In *Ward I*, *supra*, 9 Cal.5th 732, the Supreme Court addressed whether California wage laws apply to employees, such as pilots and flight attendants, who perform most of their work outside California's territorial jurisdiction. (*Id.* at p. 740.) Specifically, the court addressed section 226, which requires an employer to supply each employee "semimonthly or at the time of each payment" a written wage statement disclosing the pay period and itemizing the hours worked, applicable hourly rates, gross and net wages earned, any deductions taken, and other relevant information. (§ 226(a).) It reasoned that "the Legislature intended for section 226 to apply to workers whose work is not performed predominantly in any one state, provided that California is the state that has the most significant relationship to the work. For

---

[7]     Amici curiae similarly assert that for each pay period, *Ward I* requires the trial court to determine whether any of the aggrieved employees performed a majority of their work in a single state before applying section 226 as a result of their being based in California. On this premise, amici curiae also argue that application of the *Ward I* test is unmanageable because it requires that the aggrieved employees be tracked for each pay period.

8

interstate transportation workers and others who do not work more than half the time in any one state, . . . this principle will be satisfied if the worker performs some work here and is based in California, meaning that California serves as the physical location where the worker presents himself or herself to begin work." (*Ward I,* at p. 755.) Accordingly, the court concluded that "[s]ection 226 applies to wage statements provided by an employer if the employee's principal place of work is in California." (*Ward I, supra,* 9 Cal.5th 732, at p. 760.) For interstate transportation workers who do not work primarily in any one state, this means the worker's "base of work operations [is] in California." (*Id.* at pp. 760–761.) Thus, to satisfy the *Ward* test, Gunther needed to present evidence showing that the aggrieved employees were (1) based in California, and (2) did not work primarily in any one state. Gunther satisfied her burden of proof.

Here, Gunther and all aggrieved employees are based in California. Additionally, Alaska's own evidence showed that these employees did not work primarily in any one state. For example, Alaska tracked two flight attendants for one month in 2018. One flight attendant spent 29 percent of her time flying in or over Alaska, and 17 percent over California. The other spent 34 percent of her time in and over Alaska and 19 percent over California. Alaska also tracked three other flight attendants for an entire year. One flight attendant spent 38 percent of her time that year flying over the ocean and 24 percent in or over California. Two other flight attendants tracked for an entire year had a single month where they spent the greatest amount of time in or over California and all other months "they spent more time flying over the ocean or over Latin America."

Alaska offered no contrary evidence. Since Gunther started working for Alaska in August 2015, she has spent 27.9 percent of her time working in

California. Alaska reported that Gunther worked "the vast majority of her time" in federal airspace and in airports outside California. It presented similar evidence regarding the other aggrieved employees by analyzing a sample selection of 30 California-based flight attendants, whom the trial court found spent significantly more time "flying in or over various other states, countries, and the ocean than they did in California." At the same time, there was no evidence to suggest that any of the flight attendants worked primarily in a state other than California. Indeed, Alaska argued in the trial court and on appeal that Gunther and the aggrieved employees do not work principally in any one state, but rather primarily in federal airspace.[8]

Under *Ward I*, the relevant inquiry is a flight attendant's connection to a particular state so as to trigger application of that state's laws. (*Ward I, supra*, 9 Cal.5th at p. 752 ["The better question is what kinds of California connections will suffice to trigger the relevant provisions of California law."].) Alaska did not argue that flight attendants have any meaningful connection to states they fly over, or that a state has any interest in transportation workers flying over its state. Accordingly, Gunther and the aggrieved employees anticipated and satisfied the *Ward I* test because substantial

---

[8] Alaska's director of crew pay administration testified that for a flight from San Diego to Newark, New Jersey, he calculated the amount of time in and over California and New Jersey, but he "bucketed together" the time spent flying over all other states. By performing its calculation in this manner, Alaska effectively conceded that flight attendant time spent in federal airspace traveling *over* states would not provide information meaningful to the analysis regarding whether California-based flight attendants are entitled to section 226(a)-compliant wage statements.

evidence showed they are California-based and do not perform the majority of their work in any one state.  Thus, section 226 applies to them.[9]

To avoid this result, Alaska and amici curiae argue that California-based flight attendants are not covered for any "pay period" in which they work the majority of their time in another state.  They contend that to determine whether California wage law applies, a remand and additional discovery is required because the trial court must analyze the location of flight attendant work on a pay-period-by-pay-period basis.  This impractical argument is based on a misreading of *Ward I*.

*Ward I* stated that the "core purpose of section 226 is 'to ensure an employer "document[s] the basis of the employee compensation payments" to assist the employee in determining whether he or she has been compensated properly.' " (*Ward I, supra,* 9 Cal.5th at p. 752.)  Thus, "[a]pplication of section 226 logically depends on whether the employee's principal place of work is in California.  (*Id.* at p. 753.)  As a remedial statute, section 226 "must be liberally construed in favor of affording workers protection."  (*Id.* at p. 754.)  After examining the background of section 226, the *Ward I* court concluded that the Legislature intended to extend section 226's protections to interstate transportation workers, and others who do not work the majority

_____

9       In *Oman, supra*, 9 Cal.5th 762, some of the flight attendants were based outside of California and did not work predominantly in California. (*Id.* at p. 774.)  In this situation, our high court concluded that "[a] non-California-based employee who works in California 'only episodically and for less than a day at a time' [citation] is not entitled to a wage statement prepared according to the requirements of California law."  (*Id.* at p. 776.) Because the aggrieved employees here are based in California, *Oman* is not relevant to our analysis.

of their time in any one state, as long as these workers perform some work in California and are based in California.  (*Id.* at p. 755.)

The increment of work covered by section 226—the pay period—is relevant to this inquiry in the sense that the statute "does not operate at an hourly, daily, or even weekly level." (*Id.* at p. 753.)  The court stated that section 226 "does not appear to contemplate, for example, that an employee who works in 10 different jurisdictions over the course of a single pay period should receive 10 different wage statements, each prepared according to the laws of a different state.  Any work-location-based test for section 226 must reconcile the possibility that some employees may perform their work in more than one jurisdiction with the legislative desire for a single statement documenting employee pay." (*Ward I*, at p. 753, fn. omitted.)  Accordingly, the court rejected the argument that section 226 should only apply to workers who perform all or most of their work in a particular jurisdiction.  *Ward I* noted that "if every state were to adopt the same rule, then many transportation-sector employees—from interstate truck drivers to train conductors to the airline employees here—would not be entitled to the protections of any state's law:  Effectively, because these employees work in many jurisdictions, they would receive the protections of none." (*Ward I,* at p. 754.)

But in focusing on the pay period as the "relevant time frame" for purposes of section 226 (*Ward I, supra,* 9 Cal.5th at p. 954, fn. 8), *Ward I* did not mean that aggrieved employees are obligated to perform a pay period-by-pay period analysis to eliminate the hypothetical possibility that in one aberrant pay period some flight attendant might spend the majority of his or her time in a state other than California.  Arguing the necessity for such an inquiry on remand, Alaska seeks to deprive its employees of any wage

12

statement protections by constructing an unrealistic burden.[10]  In deciding Gunther demonstrated that section 226 applied to the aggrieved employees, the trial court appropriately adopted a broader perspective.  Alaska offered considerable evidence as to where its California-based flight attendants performed their work, yet never attempted to suggest that any such employee worked a majority of any pay period in a state other than California despite having every incentive to do so.

Alaska's own evidence demonstrated that the aggrieved employees' job activities in the aggregate meet the *Ward I* test, a proposition Alaska does not contest.  This did not require individual analysis on a pay-period-by-pay-period basis, and nothing in *Ward I* suggests otherwise.  Accordingly, a remand to mandate a pay-period-by-pay-period examination is not required.[11]

B. *Wage Order No. 9 Does Not Preclude Gunther's Wage-Statement Claims*

Alaska argues that Industrial Welfare Commission wage order No. 9-2001 (IWC Wage Order No. 9), covering the transportation industry, spells out the wage-statement rules that such employers must follow and exempts workers who entered into a collective bargaining agreement (CBA) under the RLA.  (Cal. Code Regs., § 11090, subds. (1)(E) & (7)(B).)  Gunther responds

---

[10]    The California Supreme Court did not conduct a "pay-period-by-pay-period" analysis in *Ward I*, *supra*, 9 Cal.5th 732 or *Oman*, *supra*, 9 Cal.5th 762.  Nor did the Ninth Circuit undertake such an analysis when applying the *Ward* test.  (See *Ward II*, *supra*, 986 F.3d 1234; *Bernstein v. Virgin Am., Inc.* (9th Cir. 2021) 3 F.4th 1127 (*Bernstein*).)

[11]    Because a pay-period-by-pay-period examination is not required, Alaska's request to conduct additional discovery on where flight attendants work each pay period is moot.

that Alaska did not assert this argument as a defense in the trial court and is barred from raising it for the first time on appeal. We agree with Gunther.

"[P]arties are not permitted to ' "adopt a new and different theory on appeal. To permit [them] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." [Citations.]' [Citations.] Only when the issue presented involves purely a legal question, on an uncontroverted record and requires no factual determinations, is it appropriate to address new theories." (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847, italics omitted.) We are not, however, required to apply this exception and whether to do so is within our discretion. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; see also *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1275–1276, fn. 3 ["Merely because an issue is one of law, does not give a party license to raise it for the first time on appeal . . . . Whether an appellate court will entertain a belatedly raised legal issue always rests within the court's discretion."].)

Here, Alaska did not raise this issue in its pretrial or posttrial briefing. Nor did it explain in its reply brief why it may properly raise this argument for the first time on appeal. Accordingly, we deem the argument forfeited. (See *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 798 [party forfeited claims "by failing to demonstrate either that it preserved these arguments in the trial court, or that it may properly raise such arguments for the first time on appeal"].)

In any event, our high court examined the legislative history of section 226 and rejected the argument that the Legislature intended the IWC Wage Order No. 9 exemption to foreclose claims made under section 226. (*Ward I*,

*supra*, 9 Cal.5th at pp. 743–749.)  We are bound by this decision.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[12]

C. *Alaska Has Not Shown that Federal Law Preempts Application of Section 226 to the Aggrieved Employees*

The trial court rejected Alaska's affirmative defenses that the dormant Commerce Clause, RLA, or Deregulation Act preempted the aggrieved employees' claims.  On appeal, Alaska reasserts that section 226 is preempted by the RLA and Deregulation Act.  It also contends that the dormant Commerce Clause prohibits states from regulating wage statements for interstate flight crews.  We first address the principle of federal preemption and then address each of Alaska's arguments in turn.

1. *Federal Preemption*

"Federal preemption is the principle that a federal law can supersede or supplant any inconsistent state law or regulation.  The principle stems from the supremacy clause of the United States Constitution, which establishes that federal law 'shall be the supreme Law of the Land[,] . . . Laws of any State to the Contrary notwithstanding.'  [Citation.]  Therefore, Congress has the power to enact federal laws that trump or 'preempt' conflicting state laws and may exercise that power by enacting an express preemption provision, . . . or courts may infer preemption."  (*Valencia v. SCIS Air Security Corp.* (2015) 241 Cal.App.4th 377, 383.)

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' [citation], [the court must] 'start with the assumption that the historic police

---

[12]    Gunther's unopposed June 12, 2020, request for judicial notice regarding interpretation and application of section 226 and IWC Wage Order No. 9 is denied as moot.

15

powers of the States were not to be superseded by the [federal law] unless that was the clear and manifest purpose of Congress.'" (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485.) "[T]he scope of [a] statute's pre-emption is guided by [the United States Supreme Court's] oft-repeated comment . . . [citation] that '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." (*Ibid.*) Accordingly, preemption provisions are narrowly and strictly construed. (*Charas v. TWA* (9th Cir. 1998) 160 F.3d 1259, 1265.) "[S]tate laws dealing with matters traditionally within a state's police powers are not to be preempted unless Congress's intent to do so is clear and manifest. (*Californians For Safe & Competitive Dump Truck Transp. v. Mendonca* (9th Cir. 1998) 152 F.3d 1184, 1186.) "Wage and hour laws constitute areas of traditional state regulation, although that fact alone does not 'immunize' state employment laws from preemption if Congress in fact contemplated their preemption." (*Dilts v. Penske Logistics, LLC* (9th Cir. 2014) 769 F.3d 637, 643.)

2. *The* Deregulation Act *Does Not Preempt Gunther's Claims*

"Congress enacted the [Deregulation Act] in 1978 as an amendment to the [Federal Aviation Act]. The . . . purpose [of the Deregulation Act] was to encourage airlines to compete in the marketplace by deregulating the aviation industry." (*Montalvo v. Spirit Airlines* (9th Cir. 2007) 508 F.3d 464, 474.) "Congress feared, however, that states would attempt to undo federal deregulation with regulation of their own. [Citations.] To prevent states from doing indirectly what Congress proscribed directly, Congress included an express preemption provision in the [Deregulation Act]." (*Ibid.*) The Deregulation Act preemption clause provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of

16

law *related to* a price, route or service of an air carrier . . . ." (49 U.S.C. § 41713(b)(1), italics added.)

The ordinary meaning of the phrase "related to" is a broad one—" 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection 43 with,' [citation]—and the words thus express a broad pre-emptive purpose." (*Morales v. TWA* (1992) 504 U.S. 374, 383 [analyzing the preemption provision of 49 U.S.C. § 1305(a)(1)].) A state law may be preempted even if its effect on rates, routes, or services is only indirect. (*Morales*, at p. 386.) Despite this broad preemptive purpose, "federal law does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner.' [Citation.] [S]tate laws whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes, or services." (*Rowe v. N.H. Motor Transp. Ass'n* (2008) 552 U.S. 364, 375 (*Rowe*).)

Alaska argues that requiring it to comply with the wage-statement rules contained in section 226 would significantly impact its prices, routes, and services. It claims that bringing its system into compliance with section 226 in a manner that requires it to track precisely when flight attendants clock in and clock out would take years and cost it " 'multiple millions of dollars.' " It contends this cost would dramatically affect its prices, routes, and services by reducing profitability, making it less competitive in the market and making it more " 'more susceptible . . . to economic shocks.' " To retain profitability, Alaska asserts it would have no choice but to pass these costs on to the consumer, reduce flights, or both.[13]

13    Airlines similarly assert that requiring Alaska to issue wage statements to comply with California law, and analogous laws in other jurisdictions, would significantly impede Alaska's operations. Airlines claim

17

Alaska presented evidence that it is currently impossible to track the amount of time a crew member spends flying above a given jurisdiction. Alaska's director of crew systems estimated that to track the amount of time a crew member spends flying above a given jurisdiction would take three to five years and the cost would "be multiple millions of dollars." However, as discussed above, Alaska provided no authority showing that flight attendants have any meaningful connection to states they fly over, or that a state has any interest in transportation workers flying in what Alaska itself consistently described as "federal airspace." (See *ante*, pt. A.) Rather, the evidence presented at trial establishes that the aggrieved employees satisfied the *Ward I* test because they do not work a majority of the time in any one state and are based in California. (*Ward I*, *supra*, 9 Cal.5th 732 at pp. 760–761.)

Knowing the amount of time a flight attendant spends flying above a given jurisdiction is not relevant to the issue before us—whether issuing wage statements compliant with section 226 would be so costly that it would "*significant[ly]* impact' . . . carrier rates, routes, or services." (*Rowe*, *supra*, U.S. at p. 375.) On this subject, Alaska failed to produce any evidence. Because we have no factual basis on which to judge the effect of compliance

_____

that Alaska would need to generate statements on an individual-by-individual basis to account for where flight attendants are based during that period, where they reside, and where they may work in any given pay period. Alaska would also need to overhaul its flight attendant tracking systems so as to determine where flight attendants spend the majority of their time working. Overhauling flight attendant tracking systems would be incredibly costly and to avoid this expense, Alaska and other airlines would be more likely to restrict flight attendant schedules to avoid triggering conflicting requirements. Even if Alaska and other airlines incurred the expense to overhaul their payroll systems, Airlines claim this case shows how inadvertent noncompliance would still threaten serious financial risk.

with section 226 on Alaska's rates, routes, or services, we cannot determine whether such compliance would materially impact federal deregulation, which is a prerequisite for finding this type of preemption. Accordingly, we reject Alaska's Deregulation Act preemption argument.

3. *The RLA Does Not Preempt Gunther's Claims*

" 'Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. [Citations.]' [Citation.] Congress wanted to avoid having the states apply their own state-law principles to interpret a federal labor-law collective bargaining agreement, leading to inconsistent results." (*Soldinger v. Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345, 358 (*Soldinger*).) To realize this goal, "[t]he RLA establishes a mandatory dispute-resolution mechanism for resolving certain classes of labor disputes that arise in the rail and airline industries, including what are known as 'major' and 'minor' disputes. [Citation.] Minor disputes, the sort potentially implicated here, 'involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.' [Citations.] If such a dispute is covered by the RLA, it must be resolved through the procedures established under the [RLA]; it may not be resolved by pursuing state-law claims in court." (*Ward II, supra*, 986 F.3d at p. 1244.)

We apply "a two-step test to determine whether the RLA preempts a state-law claim. First, we determine whether the claim is 'grounded in' a CBA by asking whether the claim 'seeks purely to vindicate a right or duty created by the CBA itself.' [Citation.] The RLA preempts state-law claims under this first step if the CBA is the only source of the right the plaintiff asserts; claims that merely refer to a CBA-defined right or that rely only in part on a CBA's terms are not preempted. [Citation.] Second, if a claim is

19

not preempted under the first step, we ask whether adjudicating the state-law claim requires 'interpretation of a CBA, such that resolving the entire claim in court threatens the proper role of grievance and arbitration.' [Citation.] Interpretation in this context 'means something more than "consider," "refer to," or "apply." ' [Citation.] State-law claims are preempted under this second step only 'to the extent there is an active dispute over the meaning of contract terms.' " (*Ward II*, *supra*, 986 F.3d at p. 1244; *Melendez v. San Francisco Baseball Associates LLC* (2019) 7 Cal.5th 1, 10 (*Melendez*) [applying two-part test to Labor Management Relations Act (LMRA)].)[14]

We review de novo the trial court's conclusion that RLA preemption does not apply. (*Alaska Airlines Inc. v. Schurke* (9th Cir. 2018) 898 F.3d 904, 916 (*Schurke*).) " 'Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent. [Citation.] Pre-emption of employment standards "within the traditional police power of the State" "should not be lightly inferred." ' " (*Soldinger*, *supra*, 51 Cal.App.4th at p. 359.)

Alaska asserts that the RLA exempts its flight attendants from California's wage-statement law because application of California law would involve an impermissible interpretation of the CBA. It notes that section 226 requires an accurate listing of the "hours worked" as well as the "piece rate" or "hourly rate" for each employee, but complains that flight attendants are not paid that way.[15] Instead, they are paid based on a complex CBA

---

[14] The RLA preemption standard is "virtually identical to the preemption standard the Court employs in cases involving [section] 301 of the LMRA." (*Hawaiian Airlines, Inc. v. Norris* (1994) 512 U.S. 246, 260.)

[15] "Piece-rate compensation involves a method of calculating compensation based on the type and number of tasks completed, rather than

20

formula. Thus, Alaska asserts that determining what counts as an hour "worked" or the applicable "rate" of pay cannot be accurately determined without interpreting the CBA. Alaska maintains that if it attempted to calculate and list these statistics for flight attendants, it would become embroiled in endless disputes about how to interpret the CBA.

Not surprisingly, Alaska does not assert that Gunther's claim is " 'grounded in' " the CBA for purposes of the first step of the RLA preemption analysis. (*Ward II*, *supra*, 986 F.3d at p. 1244.) Review of the operative complaint shows that Gunther's claim arises solely from section 226 and is not based on the CBA. Additionally, Gunther testified she is not challenging any provisions of the CBA. Moreover, the CBA does not address the content of wage statements and section 226 is a law that applies to all employers, whether or not covered by a CBA.

Under the second step of the analysis, the question is whether adjudicating Gunther's section 226 claim would require interpretation of the CBA. (*Ward II*, *supra*, 986 F.3d at p. 1244.) " 'A state law claim is preempted if a court must *interpret* a disputed provision of the [CBA] to determine whether the plaintiff's state law claim has merit.' " (*Melendez*, *supra*, 7 Cal.5th at p. 10, italics added.) Alaska argues that application of the wage statement requirements in section 226 would entail an impermissible interpretation of the CBA. It tenders this argument, however, without identifying any provisions in the CBA that are uncertain or disputed such that a court would need to interpret the terms rather than merely applying words with an accepted definition. (*McCray v. Marriott Hotel Servs.* (9th Cir. 2018) 902 F.3d 1005, 1012 ["[R]eading and applying relevant, unambiguous

by the number of hours worked.' " (*Ontiveros v. Safelite Fulfillment, Inc.* (C.D.Cal. 2017) 231 F.Supp.3d 531, 536.)

21

provisions of the CBA require[s] the court to only 'look to,' rather than 'interpret,' the agreement."]; *Schurke, supra,* 898 F.3d at p. 927 ["[R]eliance on and reference to CBA-established or CBA-defined terms of employment do not make for a CBA dispute if there is no disagreement about the meaning or application of any relevant CBA-covered terms of employment."].)

Stated differently, Alaska fails to explain how accurately complying with the mandates of section 226 is impossible without interpreting the CBA. Although the complex pay structure of flight attendants may render compliance with the mandates of section 226 difficult and subject to additional litigation, Alaska cites no authority that such issues provide a basis for RLA preemption.

4. *Application of Section 226 Does Not Violate the Dormant Commerce Clause*

The Commerce Clause endows Congress with the power to regulate commerce among the several states. (U.S. Const., art. 1, § 8., cl. 3.) It also limits the power of the States to enact laws imposing substantial burdens on such commerce. (*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris* (9th Cir. 2013) 729 F.3d 937, 947.) "This limitation on the states to regulate commerce is 'known as the dormant Commerce Clause.' [Citation.] The primary purpose of the dormant Commerce Clause is to prohibit 'statutes that discriminate against interstate commerce' by providing benefits to 'in-state economic interests' while 'burdening out-of-state competitors.' " (*Ibid.*)

We review challenges to local regulations under the dormant Commerce Clause using a two-tiered approach. (*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.* (1986) 476 U.S. 573, 579 (*Brown-Forman*).) First, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests

22

over out-of-state interests, [courts] have generally struck down the statute without further inquiry." (*Ibid.*) "When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [courts] have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." (*Ibid.*)

" 'Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . .  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.' " (*City of Philadelphia v. New Jersey* (1978) 437 U.S. 617, 624 (*City of Philadelphia*).)  "The crucial inquiry, therefore, must be directed to determining whether [the statute at issue] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." (*Ibid*.)  "Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, [citation], but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens." (*Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 (*Pike*).)

Under the first tier of the analysis, we must examine whether section 226 discriminates against interstate commerce or favors in-state economic interests over out-of-state interests. (*Brown-Forman, supra*, 476 U.S. at p. 579.)  Alaska does not argue that applying section 226 to the aggrieved employees results in discrimination against interstate commerce or that it favors in-state economic interests.  Accordingly, we proceed to determine

23

whether applying section 226 to the aggrieved employees amounts to the excessive indirect regulation of interstate commerce.

California's "employment laws apply to '*all individuals*' employed in this state." (*Sullivan v. Oracle Corp.* (2011) 51 Cal. 4th 1191, 1197.) As this court has stated, "[t]he Legislature enacted section 226 to ensure an employer 'document[s] the basis of the employee compensation payments' to assist the employee in determining whether he or she has been compensated properly. [Citations.] Section 226 'play[s] an important role in vindicating [the] fundamental public policy' favoring ' " 'full and prompt *payment* of an employee's earned wages.' " ' " (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 390.)

Gunther asserts that California has a legitimate state interest in ensuring that individuals working in California receive accurate wage statements, a point that Alaska does not challenge. Because section 226 regulates evenhandedly to effectuate a legitimate local public interest and only incidentally effects interstate commerce, we proceed to the second step of the analysis. There we must determine whether the incidental impact of section 226 on interstate commerce is excessive in relation to the putative local benefits. (*City of Philadelphia*, *supra*, 437 U.S. at p. 624.)

Alaska contends that applying California's wage statement law to flight attendants would excessively burden interstate commerce because their work, frequently traveling through many states in a single day, implicates many different regulatory regimes. It asserts that many states have wage-statement requirements that may apply to California-based flight attendants, singling out the states of Washington, Illinois, and Massachusetts. Alaska complains that applying California wage-statement law to it would also violate the prohibition against state laws that directly control commerce

24

occurring wholly outside the boundaries of the state and would force airlines to comply with the strictest wage-statement laws in the country or force them to provide different wage statements under different state rules.

The Ninth Circuit recently rejected this argument in *Ward II*, *supra*, 986 F.3d 1234. In *Ward II*, United Airlines argued that applying section 226 to pilots and flight attendants would "require it to track every employee's hours on a pay-period-by-pay-period basis to determine whether each employee spent more than 50 [percent] of his or her time working in another State and thus was exempt from [section] 226's coverage." (*Ward II*, at p. 1241.) It complained that the increased costs it would incur to develop this kind of tracking system "constitutes the sort of substantial burden on interstate commerce that the dormant Commerce Clause forbids." (*Ibid.*)

We have already explained why a pay-period-by-pay-period analysis is neither required nor appropriate in deciding whether California wage statement rules apply. Moreover, the court in *Ward II* accepted that United would incur "additional costs if forced to track employee time in the way that it describes," but noted that the employer "offered no evidence of what the magnitude of those costs might be" and that the additional cost of compliance with section 226 did not establish a burden on interstate commerce. (*Ward II*, *supra*, 986 F.3d at pp. 1241–1242.) The Ninth Circuit further observed that United could "easily comply with California law by issuing [section] 226-compliant wage statements to all pilots and flight attendants whose home base airport is located in California. Adopting that policy would obviate any need to track the hours each employee spends working in different States, and would (at worst) result in rare instances in which United over-complies with California law by issuing a [section] 226-compliant wage statement to a

25

California-based employee when it was not required to do so." (*Ward II*, at p. 1242.)

In *Ward II* the Ninth Circuit also addressed the argument tendered by Alaska and amicus curiae Airlines here that subjecting airlines to potentially inconsistent wage-statement regulations of multiple states would severely impact interstate commerce: "To prevail on this contention, [the airline] must show that [section] 226, as applied under the [*Ward I*] test, regulates in an area that requires national uniformity. [Citation.] It has not done so. Even if there are aspects of the interstate transportation industry that require national uniformity, employee wage statements are not among them." (*Ward II*, *supra,* 986 F.3d at p. 1242.) The court explained that while state-by-state regulation of employee wage statements might increase operating costs, United "has not demonstrated that such regulation will impair the free flow of commerce across state borders or impede operation of the national airline industry." (*Ibid.*) In particular, the airline "presented no evidence to support the conclusion that requiring it to comply with California law that differs from the wage-statement laws of other States will prove so cost-prohibitive as to disrupt the interstate service of its flights." (*Ibid.*)

The Ninth Circuit again addressed this issue in *Bernstein*, *supra*, 3 F.4th 1127, where another group of California-based flight attendants alleged that the defendant airline failed to provide accurate wage statements as required by section 226. (*Bernstein*, at p. 1133.) The *Bernstein* panel upheld the district court's decision that application of the California Labor Code did not violate the dormant Commerce Clause. (*Bernstein*, at pp. 1134, 1135–1136.) It concluded that the employer "has not identified any other state labor laws with which it might be required to comply. Indeed, because California labor law's application is based upon the parties' various contacts

with the state . . . a claim that a proliferation of similar state laws would substantially burden [defendant] is dubious.  [Defendant] does not have anything like the number of contacts with any other state that it has with California, and it fails to proffer evidence of any burden it allegedly suffers from doing business in other states with different regulations." (*Id.* at p. 1136.)

Alaska cites *United Air Lines, Inc. v. Industrial Welfare Commission* (1963) 211 Cal.App.2d 729 (*Industrial Welfare Commission*),[16] as establishing the need for national uniformity regarding flight attendant wage statements.  (See *Industrial Welfare Commission*, at pp. 748–749.)  We disagree.  This case addressed a regulation providing that "[n]o employee shall be required to contribute directly or indirectly toward the purchase or maintenance of uniforms." (*Id.* at pp. 733–734.)  The appellate court relied on the dormant Commerce Clause to invalidate the regulation, agreeing that application of the regulation to an airline imposed an undue burden on interstate commerce.  (*Id.* at pp. 747–749.)  It found that while the "burden [on interstate commerce] may not be very great," "[s]uch discrimination is bound to cause personnel troubles and to that extent, at least, a burden on interstate commerce." (*Id.* at pp. 747, 748–749.)

This 1963 case does not stand the test of time because it predates *Pike*, *supra*, 397 U.S. 137, and as such did not analyze whether the effect on interstate commerce was "clearly excessive" in relation to a legitimate local public interest.  (*Id.* at p. 142 ["Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate

---

16     *Industrial Welfare Commission*, *supra*, 211 Cal.App.2d 729 disapproved on other grounds in *Industrial Welfare Commission v. Superior Court* (1980) 27 Cal.3d 690, 728, footnote 15.

commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."].)  Only "a small number" of United States Supreme Court cases have invalidated nondiscriminatory state laws under the dormant Commerce Clause, and only "where such laws undermined a compelling need for national uniformity in regulation."  (*GMC v. Tracy* (1997) 519 U.S. 278, 299, fn. 12.)  We agree with *Ward II* that section 226 "is not comparable" to the regulations invalidated in these few cases (*Ward II*, *supra*, 986 F.3d at p. 1242), and that Alaska has failed to show a need for national uniformity regarding employee wage statements.

D.  *PAGA Penalties*

Alaska contends that the award of over $25 million in PAGA penalties under section 226.3 must be vacated because (1) Gunther's initial PAGA letter failed to provide adequate notice of her claims, and she thus failed to exhaust her administrative remedies, divesting the trial court of jurisdiction to consider her PAGA claim, (2) the trial court wrongly allowed PAGA penalties based on "estimated" violations instead of actual violations,[17] (3) the trial court wrongly imposed heightened penalties under section 226.3 because this statute does not apply, and (4) the trial court erred by penalizing it for every deficient wage statement it sent out after Gunther merely alleged violations and before any court adjudicated her claims.

We conclude that Gunther exhausted her administrative remedies because her initial PAGA letter provided adequate notice of her claims.  Even assuming Gunther provided defective notice of her claims, Alaska forfeited its

---

[17]   CELC argues that the trial court's imposition of PAGA penalties based on estimated violations violated due process.

28

contention that she failed to exhaust administrative remedies by not raising this issue in the trial court. We also conclude that the penalty provisions of section 226.3 do not apply to these facts and that the matter must be remanded to determine the appropriate civil penalty under a different statute—subdivision (f)(2) of section 2699.[18]

    1. *Basic Legal Principles Regarding PAGA Penalties*

PAGA authorizes aggrieved employees to act as private attorneys general and collect "civil penalt[ies]" for Labor Code violations where the LWDA has been notified and does not itself take action. (§ 2699, subd. (a).) Before bringing a PAGA claim, an aggrieved employee must first exhaust administrative procedures set out in former section 2699.3,[19] which includes providing notice to the employer and the LWDA "of the specific provisions of [the Labor Code] alleged to have been violated, including the facts and theories to support the alleged violation." (Former § 2699.3, subd. (a)(1)(A).) "The notice requirement allows the relevant state agency 'to decide whether to allocate scarce resources to an investigation.'" (*Kim v. Reins International California, Inc.* (2020), 9 Cal.5th 73, 81 (*Kim*).)

A PAGA suit is representative in nature such that the plaintiff is "suing on behalf of *all* affected employees," but "'a representative action under PAGA is not a class action.'" (*Kim*, *supra*, 9 Cal.5th at p. 87.) Rather, a PAGA claim is technically "an enforcement action between the LWDA and

---

[18]    This latter conclusion makes it unnecessary to address Alaska's arguments the trial court wrongly (1) allowed PAGA penalties based on "estimated" violations and (2) imposed penalties under section 226.3 for subsequent citations.

[19]    Former section 2699.3 remained in effect until July 1, 2021 and was replaced by current section 2699.3. (Former § 2699.3, subd. (e); Stats. 2016, ch. 31, § 190.)

the employer," with the plaintiff acting as a proxy for the government. (*Kim*, at p. 86.) "Of the civil penalties recovered, 75 percent goes to the [LWDA], leaving the remaining 25 percent for the 'aggrieved employees.'" (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980–981.) "The purpose of PAGA is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code." (*Brown v. Ralphs Grocery Co.* (2011) 197 Cal.App.4th 489, 501.)

"The central provision of PAGA is section 2699. Subdivision (a) of the statute permits aggrieved employees to recover civil penalties that previously could be collected only by LWDA. [Citation.] In addition, to address violations for which no such penalty had been established, subdivision (f) of the statute created 'a default penalty and a private right of action' for aggrieved employees." (*Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 216.) The Labor Code also allows for heightened penalties for a violation of section 226(a) of $250 "per employee per violation in an initial citation" and $1,000 "per employee for each violation in a subsequent citation, for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in" section 226(a). (§ 226.3.)

2. *Gunther Provided Sufficient PAGA Notice*

Gunther's September 29, 2017 section 2699.3 notice of Labor Code violations (the PAGA letter) generally alleged that Alaska violated several Labor Code provisions by failing "to pay wages earned" and "maintain[ing] adequate or accurate employment records." Regarding Alaska's purported violation of section 226, the letter stated:

> "Alaska Airlines has *violated California Labor Code § 226 by willfully failing to furnish Flight Attendant employees accurate, itemized wage statements showing the actual*

30

*wages earned, among other things. As set forth herein, Alaska Airlines failed to pay wages owed and frequently altered employee wage statements to pay flight attendant employees less than they actually earned.* In addition, employers are required to afford employees the right to inspect their employment records. (Cal. Labor Code, § 226(b).) Alaska Airlines has violated California Labor Code § 226(b) in that it does not maintain proper employment records that would accurately reflect the wages earned of its flight attendants. Furthermore, it does not and has refused to provide access to such records to its flight attendants. *As a result of Alaska Airlines' violations of California Labor Code § 226(a) and (b)*, Alaska Airlines is liable for civil penalties pursuant to California Labor Code § 226.3 and 2698, et seq. Pursuant to Section 226.3, Alaska Airlines is subject to a $250 per employee per violation civil penalty for its failure to keep accurate and sufficient employment records as required under subdivision (a) of Section 226." (Italics added.)

Without additional discussion, the trial court concluded that Gunther's PAGA letter "identified Alaska's [section] 226 violations and the facts and theories in support of such claims."

Alaska contends that Gunther's PAGA claim should have been dismissed because the PAGA letter did not properly notify it or the Labor Commissioner of the facts and theories supporting the wage statement claims that Gunther pursued at trial. At most, it claims, the letter advised of potential violations of section 226(a)(1) (requirement to display gross wages earned) and section 226(a)(5) (requirement to display net wages earned) but did not provide notice of the alleged violations that ultimately formed the basis of the trial court's decision—that the wage statements failed to comply with section 226(a)(2), (3) and (9) regarding total hours worked, the number of piece-rate units earned and any applicable piece rate, or all applicable hourly rates in effect and number of hours worked at each rate. We conclude

31

that Gunther's PAGA letter provided Alaska with sufficient notice of her PAGA claims under section 226. And even if the notice was defective, Alaska forfeited the failure to exhaust administrative remedies issue by not raising it at trial.

"The Legislature enacted PAGA to remedy systemic underenforcement of many worker protections. This underenforcement was a product of two related problems. First, many Labor Code provisions contained only criminal sanctions, and district attorneys often had higher priorities. Second, even when civil sanctions were attached, the government agencies with existing authority to ensure compliance often lacked adequate staffing and resources to police labor practices throughout an economy the size of California's." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 (*Williams*).) To resolve these problems, the Legislature "adopt[ed] a schedule of civil penalties ' "significant enough to deter violations" ' for those provisions that lacked existing noncriminal sanctions," and to "deputiz[e] employees harmed by labor violations to sue on behalf of the state and collect penalties, to be shared with the state and other affected employees." (*Ibid.*)

Accordingly, before filing a PAGA suit, "[t]he aggrieved employee or representative shall give written notice by online filing with the [LWDA] and by certified mail to the employer of the *specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation.* (Former § 2699.3, subd. (a)(1)(A), italics added.) "The evident purpose of the notice requirement is to afford the relevant state agency, the [LWDA], the opportunity to decide whether to allocate scarce resources to an investigation, a decision better made with knowledge of the allegations an aggrieved employee is making and any basis for those allegations." (*Williams, supra*, 3 Cal.5th at pp. 545–546.) "If the agency does not

32

investigate, does not issue a citation, or fails to respond to the notice within 65 days, the employee may sue." (*Kim*, *supra*, 9 Cal.5th at p. 81; see former § 2699.3, subd. (a).)

As one federal district court explained, " 'PAGA notice must be specific enough such that the LWDA and the defendant can glean the underlying factual basis for the alleged violations.' [Citation.]  Conversely, 'a string of legal conclusions with no factual allegations or theories of liability to support them . . . is insufficient to allow the [LWDA] to intelligently assess the seriousness of the alleged violations.' [Citations.]  Plaintiff, however, need not set forth 'every potential fact or every future theory.' [Citations.]  'Under California's Labor Code, a written notice is sufficient so long as it contains some basic facts about the violations, such as which provision was allegedly violated and who was allegedly harmed.' " (*Stevens v. Datascan Field Services LLC* (E.D.Cal., Feb. 17, 2016, No. 2:15-cv-00839-TLN-AC) 2016 U.S.Dist. Lexis 19289 at p. *11; *Alcantar v. Hobart Serv.* (9th Cir. 2015) 800 F.3d 1047, 1057 ["Plaintiff's letter—a string of legal conclusions with no factual allegations or theories of liability to support them—is insufficient to allow the [LWDA] to intelligently assess the seriousness of the alleged violations.  Neither does it provide sufficient information to permit the employer to determine what policies or practices are being complained of so as to know whether to fold or fight."].)

In *Williams*, *supra*, 3 Cal.5th 531, the Supreme Court addressed whether "an aggrieved employee seeking to pursue civil penalties on behalf of other current or former employees [under PAGA] must have some modicum of substantial proof before proceeding with discovery" on the allegations made in the PAGA letter.  (*Williams,* at p. 545.)  In this context the court stated that "California public policy favors the effective vindication of

consumer protections." (*Id.* at p. 548.) "Hurdles that impede the effective prosecution of representative PAGA actions undermine the Legislature's objectives." (*Williams,* at p. 548.) *Williams* further noted that "[n]othing in . . . [former] section 2699.3, subdivision (a)(1)(A), indicates the 'facts and theories' provided in support of 'alleged' violations must satisfy a particular threshold of weightiness, beyond the requirements of nonfrivolousness generally applicable to any civil filing." (*Williams,* at p. 545.)

Applying this standard in light of the plain language of the statute, we conclude that Gunther's letter satisfied PAGA's minimal notice requirements. Gunther identified the specific provisions of the Labor Code that Alaska allegedly violated, section 226, subdivisions (a) and (b). Regarding her theory of liability, Gunther stated that Alaska "willfully fail[ed] to furnish Flight Attendant employees accurate, itemized wage statements." Facts supporting this theory of liability included that the wage statements failed to show "the actual wages earned, among other things" and "failed to pay wages owed and frequently altered employee wage statements to pay flight attendant employees less than they actually earned." Gunther's letter contained sufficient information to put Alaska and the LWDA on notice for potential investigation, which satisfies the policy goal of subdivision (a) of former section 2699.3 to effectively vindicate consumer protections. (*Williams, supra*, 3 Cal.5th at p. 548.)

Even were we to assume that Gunther provided defective notice, Alaska forfeited the exhaustion argument by not raising it at trial because this is an affirmative defense subject to waiver.[20] (*Mokler v. City of Orange*

---

[20]    In its answer, Alaska raised the affirmative defense that Gunther's failure to exhaust administrative remedies barred her PAGA claim. Specifically, Alaska alleged that Gunther failed to "provide sufficient notice of

34

(2007) 157 Cal.App.4th 121, 133–136 [failure to exhaust administrative remedies under FEHA (Fair Employment and Housing Act) may not be raised for the first time on appeal and after full trial on merits]; *People ex rel. DuFauchard v. U.S. Financial Management, Inc.* (2009) 169 Cal.App.4th 1502, 1511–1513 [following *Mokler* in *Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816 action]; *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 ["We think it would be grossly unfair to allow a defendant to ignore this potential procedural defense [of failure to exhaust administrative remedies] at a time when facts and memories were fresh and put a plaintiff to the time and expense of a full trial, knowing it could assert the failure to exhaust administrative remedies if it received an adverse jury verdict."].)

Although no California court has addressed whether forfeiture applies to a PAGA claim, federal district courts have held that the failure to exhaust administrative remedies under PAGA is an affirmative defense subject to waiver. (*Batson v. United Parcel Service, Inc.* (S.D.Cal. Sept. 27, 2012, No. 12cv0839 BTM(JMA)) 2012 U.S.Dist. Lexis 139567, p. *6 ["failure to exhaust administrative remedies under the PAGA is an affirmative defense subject to

---

her factual allegations and/or theories of liability to (i) allow the [LWDA] to assess the alleged violations, or (ii) allow Defendants to determine what policies or practices were being complained of." In its summary judgment filings, however, Alaska did not argue that the alleged defective notice in Gunther's PAGA letter amounted to a failure to exhaust administrative remedies which barred her PAGA claim. Accordingly, in denying Alaska's summary judgment motion, the trial court did not address this affirmative defense. Rather, it rejected Alaska's argument that Gunther's *pleadings* failed to provide Alaska notice of this claim.

Alaska has not cited us to anywhere in the record showing that it asked the trial court to rule on the merits of its failure to exhaust affirmative remedies defense.

waiver" if not pled]; *In re Taco Bell Wage and Hour Actions* (E.D.Cal., Apr. 8, 2016 No. 1:07-CV-01314-SAB) 2016 WL 2755938, p. *2, fn. 1 [failure to move for dismissal of PAGA claim based on failure to exhaust waived the defense]; see also *Alcantar v. Hobart Serv.* (C.D.Cal. Jan.22, 2013, No. ED 11-cv-1600 PSG (SPx)) 2013 U.S.Dist. Lexis 8610, at pp. *11–*14 [concluding that the employer did not waive the failure to exhaust defense under PAGA by waiting until the eve of trial to raise the defense because employer pled the defense in its answer and this is sufficient to preserve the defense under the Federal Rules of Civil Procedure].)[21]

Here, Alaska's answer raised the affirmative defense that Gunther's failure to exhaust administrative remedies barred her PAGA claim. (*Ante*, fn. 19.) But Alaska never pursued this argument. In its summary judgment filings Alaska mentioned the PAGA letter, but it did not argue that the letter amounted to defective PAGA notice and thus a failure to exhaust administrative remedies. Accordingly, the court's denial of Alaska's summary judgment motion did not address this affirmative defense. Rather, it rejected Alaska's argument that Gunther's *pleadings* failed to provide

---

[21] Alaska's citation to *Khan v. Dunn-Edwards Corp.* (2018) 19 Cal.App.5th 804 (*Khan*) for the proposition that dismissal of a PAGA claim is required where plaintiff " 'failed to comply with the administrative requirement' " because PAGA letter " 'failed to give fair notice' " is misplaced. In *Khan*, the appellate court affirmed the granting of summary judgment on a PAGA claim because the plaintiff's notice failed to specify the aggrieved employees. (*Khan,* at pp. 809–810.) *Khan* did not involve a defendant, like Alaska, who argued the merits of its affirmative defense for the first time on appeal *after* a trial on the merits. *Miller v. United Airlines, Inc.* (1985) 174 Cal.App.3d 878 is also inapposite for the same reason. In *Miller* the appellate court found summary judgment proper for defendants because plaintiff admitted at deposition that she failed to exhaust her administrative remedies in her action under the FEHA. (*Miller,* at p. 890.)

adequate notice of this claim.  Similarly, Alaska has not referred us to anything in the record showing that it asked the trial court to rule on the merits of its exhaustion affirmative defense.

3.  *Heightened Penalties Under Section 226.3 Apply Only Where the Employer Fails to Provide a Wage Statement or Fails to Keep Adequate Records*

The trial court noted that PAGA provided a "default" civil penalty under subdivision (f)(2) of section 2699.  But relying on *Raines v. Coastal Pacific Food Distributors* (2018) 23 Cal.App.5th 667 (*Raines*), the court concluded that this lesser penalty did not apply because section 226.3 provided a specific (and higher) penalty for failure to comply with section 226(a).  Section 226.3 provides in part:

> "Any employer who violates subdivision (a) of Section 226 shall be subject to a civil penalty in the amount of two hundred fifty dollars ($250) per employee per violation in an initial citation and one thousand dollars ($1,000) per employee for each violation in a subsequent citation, *for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in subdivision (a) of Section 226*.  The civil penalties provided for in this section are in addition to any other penalty provided by law."  (Italics added.)

Assuming the propriety of PAGA penalties in some amount, Alaska contends that the bolded language means what it says—that heightened penalties under section 226.3 apply only where the employer fails to provide wage statements or keep required records.  Because it provided wage statements and kept the required records, Alaska argues that the $25 million in heightened penalties awarded by the trial court should be vacated and the matter remanded with an instruction to apply the default penalty amounts set forth in subdivision (f)(2) of section 2699.  Relying on *Raines*, *supra*, 23 Cal.App.5th 667, Gunther asserts that section 226.3 provides a civil penalty

for all violations of section 226 and is not limited to situations where the employer fails to provide a wage statement or to keep records.

"Questions of statutory interpretation are subject to de novo review. [Citation.] '[O]ur primary task is to determine the lawmakers' intent.' [Citation.] Statutory interpretation to determine legislative intent may involve up to three steps. [Citation.] 'The first step in the interpretive process looks to the words of the statute themselves.' [Citation.] 'It is only when the meaning of the words is not clear that courts are required to take a second step and refer to the legislative history.' [Citation.] If an ambiguity remains after reviewing secondary rules of construction, we then ' " 'apply reason, practicality, and common sense.' " ' " (*Curtis Engineering Corp. v. Superior Court* (2017) 16 Cal.App.5th 542, 546.) Additionally, "[w]e interpret the language of the statute 'in context, examining other legislation on the same subject, to determine the Legislature's probable intent.' [Citation.] The statutory language is construed in light of the entire statute and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. [Citation.]' [Citations.] We avoid an interpretation that renders any portion of the statute superfluous, unnecessary, or a nullity; this is so because we presume that the Legislature does not engage in idle acts." (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1027–1028.)

In accordance with these principles, we begin our consideration of section 226.3 by examining the words of the statute. That language provides that an employer who violates section 226(a) is subject to a civil penalty in differing amounts for an initial citation and any subsequent citations "for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in" section 226(a). Under the plain

38

meaning of these words, the heightened penalties under section 226.3 apply only where the employer either fails to provide a wage statement or fails to keep required records as required by section 226(a).  Gunther's interpretation would make some of the statutory language—"for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in subdivision (a) of Section 226"—superfluous.  Had the Legislature intended that the heightened penalties of section 226.3 be triggered for *any* violation of section 226(a), it could easily have achieved this result by simply eliminating this language.  It is a safe assumption that in drafting a statute, the Legislature does not intend to include words with no function.  (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 ["An interpretation that renders statutory language a nullity is obviously to be avoided.' "].)

Gunther does not argue that section 226.3 is unclear or ambiguous. Rather, to avoid the words of the statute and the absurdity of ignoring their plain meaning, Gunther argues that *Raines*, *supra*, 23 Cal.App.5th 667 expressly held that section 226.3 applies to "*all* violations of section 226." (*Raines,* at p. 675.)  *Raines* addressed the remedy for a technical violation of section 226(a)(9) by a defendant who failed to provide a wage statement that included the overtime hourly rate. (*Raines,* at p. 673.)  The court concluded that three possible remedies existed for this violation:  (1) statutory penalties to employees who suffered an injury under subdivision (e)(1) of section 226; (2) injunctive relief under subdivision (h) of section 226; and (3) civil penalties under section 226.3 for a violation of section 226(a). (*Raines,* at p. 673.)  The plaintiff, however, sought recovery under the default provision of section 2699, subdivision (f), applicable where there is no existing civil penalty. (*Raines,* at p. 674.)  In this context, the *Raines* court stated:

"Federal courts disagree whether subdivision (a) or subdivision (f) of section 2699 applies where the allegation is the failure to provide adequate wage statements. Some courts have read section 226.3 to limit civil penalties to only those instances where the employer failed to provide *any* wage statement or to keep records. (*York v. Starbucks Corp.* (C.D.Cal., Nov. 1, 2012, No. CV 08-07919 GAF) 2012 U.S.Dist. Lexis 190239, pp. *11–*12; *Fleming v. Covidien, Inc.* (C.D.Cal., Aug. 12, 2011, No. ED CV-10-01487 RGK) 2011 U.S.Dist. Lexis 154590, at p. *7.)[ ] We find more persuasive a decision that found section 226.3 sets out a civil penalty for *all* violations of section 226. (*Culley v. Lincare, Inc.* (E.D.Cal. 2017) 236 F.Supp.3d 1184, 1194.)" (*Raines*, at pp. 674–675, fn. omitted.)

The *Raines* court then concluded that "[s]ection 226.3 provides the civil penalty for failure to comply. In our view, LWDA would not be prohibited from seeking civil penalties for a grossly inadequate wage statement simply because the employer did provide a statement. Otherwise, the purpose of the statute would be thwarted." (*Raines*, *supra*, 23 Cal.App.5th at p. 675.) Of course the choice is *not*, as *Raines* suggests, between a penalty under section 226.3 and no penalty for an inadequate wage statement. Instead, the question is *which* penalty provision applies—the default penalty in section 2699, subdivision (f) or the heightened penalty under section 226.3? Thus, under either result the statute is not "thwarted." Moreover, *Raines* and the federal district court decision on which it relied (*Culley v. Lincare, Inc.* (E.D.Cal. 2017) 236 F.Supp.3d 1184), provided no analysis of the statutory language to support a conclusion that section 226.3 applies to any violation of section 226(a). Accordingly, we decline to follow *Raines* on this point.[22]

---

[22] Although several federal district courts have followed *Raines*, *supra*, 23 Cal.App.5th 667, they all did so without any analysis of the statutory language and often expressly noting that *Raines* was a binding state court

Here, it is undisputed that Alaska provided wage statements to its flight attendants, and Gunther dismissed her challenge that Alaska failed to maintain records.  Because the violations found by the trial court resulted from Alaska's failure to include certain information in its wage statements, Alaska should have been subject to the default civil penalties in section 2699, subdivision (f)(2), not the heightened penalties in section 226.3.  Accordingly, we reverse the section 226.3 penalties and remand the matter to the trial court for further proceedings regarding civil penalties under section 2699, subdivision (f)(2), which provides a $100 civil penalty "for each aggrieved employee per pay period for the *initial violation* and two hundred dollars ($200) for each aggrieved employee per pay period for each *subsequent violation*."  (Italics added.)  To assist the trial court on remand, we note that the increased $200 civil penalty for "subsequent violation[s]" does not apply unless Gunther presents evidence that the Labor Commission or a court notified Alaska that it was in violation of the Labor Code.  (*Bernstein*, *supra*, 3 F.4th at p. 1144; see *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1209 ["Until the employer has been notified that it is violating a Labor Code provision . . . the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties."].)

decision under *Hanna v. Plumer* (1965) 380 U.S. 460, 465.  (See *Clayborne v. Lithia Motors, Inc.* (E.D.Cal., Jan. 5, 2021, No. 1:17-cv-00588-AWI-BAM) 2021 U.S.Dist. Lexis 1323, at pp. *13–*14; *Garcia v. Commonwealth Fin. Network* (S.D.Cal., Nov. 24, 2020, No. 20-cv-1483-BAS-LL) 2020 U.S.Dist. Lexis 22053, at pp. *10*11; *Biag v. King George - J&J Worldwide Services LLC* (S.D.Cal., July 22, 2020, No. 20-cv-307-BAS-DEB) 2020 U.S.Dist. Lexis 129528, at pp. *26–*28 [bound by *Raines*]; *Raziano v. Albertsons LLC* (C.D.Cal., Dec. 13, 2019, No. LA CV19-04373 JAK(ASx) 2019 U.S.Dist. Lexis 232455, at pp. *18–*20 [same]; *Magadia v. Wal-Mart Associates, Inc.* (N.D.Cal. 2019) 384 F.Supp.3d 1058, 1109 [same], rev'd in part, vacated in part by *Magadia v. Wal-Mart Associates, Inc.* (9th Cir. 2021) 999 F.3d 668.)

E. *Attorney's Fees*

    1. *Additional Procedural Background*

Gunther's complaint alleged three causes of action for (1) failure to pay for hours worked under section 204, (2) failure to provide accurate wage statements and maintain employment records under sections 226 and 1174, and (3) violation of the unfair competition law. Gunther also sought civil penalties under PAGA. In February 2019, the trial court denied Alaska's summary judgment motion. The day before the scheduled trial, Gunther dismissed her claims under sections 204 and 1174, as well as her cause of action alleging a violation of the unfair competition law. Accordingly, trial proceeded on that portion of the second cause of action alleging a violation of section 226.

After the trial court entered its judgment, Gunther moved for an award of attorney's fees and costs under sections 226, subdivision (h) and 2699, subdivision (g)(l). Gunther argued that her counsel devoted two years and over 1,600 hours of billable time while incurring over $70,000 in costs to prosecute Alaska for its failure to provide required pay documents. She noted that the case involved novel legal and complex factual issues; she emphasized the financial risk her attorneys bore given the contingent representation and large advanced costs. In granting Gunther's request for attorney's fees, the trial court commented on Gunther's decision to dismiss certain claims, stating, "[Gunther's] decision to jettison certain claims appears to be as much a product of admitting the infirmity of certain claims as it was a strategic decision to jettison those issues that might give rise to complexity and, to an extent, might 'bog down' the focus on the strongest of [her] claims."

In calculating the lodestar, the trial court rejected Alaska's argument that the time spent on the dismissed causes of action should be omitted. The

court reasoned that all of Gunther's claims arose from the " 'same set of facts' " that were " 'related' " and found that Gunther won " 'substantial relief' on the original thrust of her claim, which was a concern that she was not being adequately paid, part of which stemmed from an inability to determine how her pay was being calculated and what she was being paid for." (Underscore omitted in first quote.) Accordingly, the trial court declined to reduce the lodestar amount because Gunther failed to prevail on every issue.

The trial court also rejected Alaska's argument that a lack of efficiency resulted in the lodestar being too high:

> "While Alaska argues that this was a short case (i.e. only a 3-day trial), that economy was the result of [Gunther] jettisoning certain claims in order to maintain a tight focus in this case and avoid being bogged down by certain complexities that risked compounding and multiplying a number of confusing issues, which, in turn, would gobble up additional time. Given that history, while [Gunther's] approach did include some claims that were initially broader than necessary, this Court ultimately finds that [Gunther's] overall approach in this litigation has erred on the side of efficiency and economy."

The trial court calculated the lodestar amount to be $755,888. It then applied a multiplier of 1.25 to account for the contingent nature of the fee award and awarded Gunther $944,860 in attorney's fees.

2. *The Trial Court Did Not Abuse Its Discretion in Making the Attorney's Fees Award*

PAGA provides that a successful employee "shall be entitled to an award of attorney's fees and costs. . . ." (§ 2699, subd. (g)(l).) Additionally, an employee seeking injunctive relief under section 226 "is entitled to an award of costs and reasonable attorney's fees." (§ 226, subd. (h).) "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate."

43

(*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).)  "The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.  [Citation.]  Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary."  (*Ibid.*)  The trial court may also apply a multiplier based on contingent risk, exceptional skill, or numerous other factors.  (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132–1134, 1138–1139.)

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court. . . . [Citations.]  The value of legal services performed in a case is a matter in which the trial court has its own expertise.  [Citation.]  The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony.  [Citations.]  The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' "  (*PLCM Group*, *supra*, Cal.4th at p. 1096.)  A "plaintiff's joinder of causes of action should not dilute its right to attorney's fees.  Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129–130.)

Alaska does not contest Gunther's right to an attorney's fees award, the 1.25 multiplier, or the reasonableness of the rates claimed, but it nonetheless asserts two independent bases for reversal of the fee award.  First, assuming

we reverse the over $25 million in civil penalties awarded under section 226.3, Alaska contends this compels reversal of the postjudgment attorney's fees award in its entirety because other courts have considered the amount of the monetary award in assessing the reasonableness of fees. (See, e.g., *Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 381 (*Espejo*) ["Because the degree of success plaintiffs will achieve after redetermination of their monetary award on remand may change, the court's assessment of the degree of success achieved by plaintiffs' counsel could also change."].) Second, it argues that the amount awarded was unreasonable because Gunther achieved only limited success and the fee award included compensation for work that was not related to the prevailing wage-statement claim.

The record supports a conclusion that a recalculation of PAGA penalties will not affect Gunther's " 'degree of success' " as it relates to the attorney's fees award. Thus, the attorney's fees order is unaffected by the trial court's error in calculating PAGA penalties. We also reject Alaska's contention that the court was required to reduce the attorney's fees award based on Gunther's limited success in the litigation.

> a. *The error in calculating penalties under section 226.3 did not materially affect the trial court's assessment of Gunther's success.*

An order awarding attorney fees " 'falls with a reversal of the judgment on which it is based.' " (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 220.) But where, as here, there is a limited reversal, we remand for the trial court to consider anew the propriety of attorney's fees unless we can say with certainty the court would have exercised its discretion the same way had the successful party not prevailed on the issue on which we

45

reverse. (*Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1233–1235.)

Here, our reversal is limited to the civil penalties awarded under section 226.3, of which 75 percent would have gone to the State of California. (§ 2699, subd. (i).) Other than this limited issue, Alaska's appeal did not change Gunther's success in this litigation. Notably, Alaska did not challenge the equitable relief awarded by the trial court requiring it to provide section 226-compliant wage statements to all California based Alaska flight attendants. As a result of this litigation, the aggrieved employees will obtain the information necessary to independently ensure they receive all compensation earned and owed. That the trial court here awarded civil penalties under the wrong statute does not materially impact the degree of Gunther's success in this litigation. (See *Riverside v. Rivera* (1986) 477 U.S. 561, 574, (plur. opn. of Brennan, J.) ["[A] civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. . . . [and] often secures important social benefits that are not reflected in nominal or relatively small damages awards."].)

In awarding attorney's fees, the trial court rejected Alaska's argument regarding inflated billing and refused to decrease the lodestar calculation. In setting the multiplier, the court stated that it considered "the quality of the representation" in the lodestar amount. It concluded that a multiplier was warranted based on the "contingency fee risk" that Gunter's counsel assumed when agreeing to take the case. The trial court, however, rejected Gunther's suggested 4.3 multiplier as "very high." It found that the case involved "novel and difficult issues" and concluded "that a multiplier of 1.25 is appropriate as it compensates counsel entirely for the time actually spent, but also provides

46

an increased award that accounts for the risks of taking a novel and difficult case."

The trial court did not place significant reliance on the extent of Gunther's monetary success in this litigation.  Critically, it never attempted to justify or cross-check the lodestar attorney's fees award by reference to a percentage of a monetary fund created by the litigation, and Alaska makes no challenge in that regard.  (See, e.g., *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 49.)  On this record, we see no likelihood the trial court would have exercised its discretion differently in the absence of the error regarding the civil penalties.

> b. *The trial court properly declined to reduce the lodestar based on alleged "limited success."*

"California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees.  [Citation.]  'Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], "under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success" . . . .'  [Citation.]  The trial court may reduce the amount of the fee award 'where a prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit.' "  (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2010) 190 Cal.App.4th 217, 238 (*Environmental Protection*).)

In evaluating the impact "limited success" has on an award of attorney's fees, we apply the two-step test outlined in *Hensley v. Eckerhart*

(1983) 461 U.S. 424 (*Hensley*).[23] (*Environmental Protection, supra,* 190 Cal.App.4th at p. 238.) We first evaluate "whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he [or she] succeeded[.]' " (*Environmental Protection,* at p. 239.) "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." (*Hensley,* at p. 440.) If the court finds that successful and unsuccessful claims are related, "the court proceeds to the second step of [the] *Hensley* inquiry, which asks whether 'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.' " (*Environmental Protection,* at p. 239.) "Where a plaintiff has obtained excellent results, his [or her] attorney should recover a fully compensatory fee." (*Hensley,* at p. 435.) "There is no precise formula for making these determinations . . . . The court necessarily has discretion in making this equitable judgment." (*Id.* at pp. 436–437.)

Here, Alaska asserts that Gunther's successful wage-statement claim— and the associated PAGA penalties—were not related to her claims regarding a failure to pay wages for all hours worked under section 204 and a failure to maintain employment records under section 1174. According to Alaska, these additional claims involved separate and distinct factual allegations and legal theories. Because these other claims were by definition "unsuccessful" in that they were dismissed prior to trial, Alaska contends the trial court erred in failing to reduce counsel's lodestar due to Gunther's incomplete success in achieving the original objectives of her litigation. And even assuming

---

[23] *Hensley, supra,* 461 U.S. 424 abrogated in part on other grounds by *Gisbrecht v. Barnhart* (2002) 535 U.S. 789, 795–805.

48

Gunther's dismissed claims were in some sense related to her section 226 claim, Alaska argues that the fee award still should have been reduced because the dismissed claims were important-but-unsuccessful goals of her lawsuit.

We conclude that the trial court did not abuse its discretion in finding that Gunther's dismissed claims under section 204 (failure to pay for hours worked) and section 1174 (failure to maintain employment records) were related to the Gunther's successful wage-statement violation claim under section 226. The *Hensley* court recognized that "there is no certain method of determining when claims are 'related' or 'unrelated.'" (*Hensley*, *supra*, 461 U.S. at p. 437, fn. 12.) Claims may be unrelated if they are "based on different facts and legal theories." (*Id.* at p. 434.) Conversely, related claims "will involve a common core of facts or will be based on related legal theories." (*Id.* at p. 435; *Muniz v. United Parcel Service, Inc.* (9th Cir. 2013) 738 F.3d 214, 224 ["*Hensley* cautions that, before hours may be deducted specifically for unsuccessful claims, the claims must be suitable for entirely separate lawsuits."].)

Review of Gunther's operative complaint shows that her dismissed claims under sections 204 and 1174 arose from the same core set of facts as her successful section 226 claim. In declining to require that Gunther "pars[e] out the various billing items" for her three claims alleging Labor Code violations, the trial court found that Gunther "won 'substantial relief' on the original thrust of her claim, which was a concern that she was not being adequately paid, part of which stemmed from an inability to determine how her pay was being calculated and what she was being paid for." As Gunther notes, Alaska's insufficient wage statements made it difficult for her to prove that Alaska failed to pay for hours worked under section 204. Accordingly,

49

once Gunther obtains wage statements as ordered by the trial court, she will then be able to discern whether she received pay for all hours worked. Under these facts, we cannot find that the trial court abused its discretion in finding all claims to be related.

The second step of the inquiry requires that the trial court evaluate the significance of the overall relief obtained by plaintiff in relation to the hours reasonably expended on the litigation and reduce the lodestar calculation if the relief is limited in comparison to the scope of the litigation as a whole. (*Espejo*, *supra*, 13 Cal.App.5th at p. 382.) On this point, Alaska argues that the trial court "did not meaningfully consider Gunther's limited success."

As a preliminary matter, "there is no general rule requiring trial courts to explain their decisions on motions seeking attorney fees." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 101.) Accordingly, we draw no negative inference from an explanation Alaska considers to be "inadequate." In any event, the trial court expressly considered and then rejected Alaska's argument that time spent on Gunther's dismissed claims should not be included in the lodestar calculation.

Alaska has failed to convince us that the trial court's decision constituted an abuse of discretion. As stated by the United States Supreme Court, "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." (*Hensley*, *supra*, 461 U.S. at p. 435.) Here, due to Gunther's efforts, she defeated Alaska's numerous affirmative defenses and obtained an injunctive order mandating that Alaska comply with section 226(a). The trial court was in the best position to evaluate Gunther's degree of "success" in this litigation considering all the claims asserted and adjudicated, and we decline to substitute our judgment for that of the court on this issue.

50

In summary, we conclude that the trial court did not abuse its discretion in awarding Gunther attorney's fees for the time spent on her dismissed claims and affirm the attorney's fees award.

## DISPOSITION

The penalties awarded under Labor Code section 226.3 are reversed and the matter is remanded for further proceedings to determine the penalty amount under Labor Code section 2699, subdivision (f)(2). In all other respects, the judgment and postjudgment order on attorney's fees are affirmed. In the interest of justice, each party shall bear their own costs.


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.

51